**BEDDING, CURTAIN AND DRAPERY WORKERS UNION, LOCAL 140 OF the UNITED FURNITURE WORKERS OF AMERICA, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 134, Docket 31398.

United States Court of Appeals
Second Circuit.

Argued Dec. 11, 1967.

Decided Jan. 19, 1968.

Victor Rabinowitz, New York City (Rabinowitz & Boudin, Leonard B. Boudin, Lee A. Albert, New York City, on the brief), for petitioner.

Allison W. Brown, Jr., Attorney, N.L.R.B. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Joseph C. Thackery, Washington, D. C., Attorney, on the brief), for respondent.

Before KAUFMAN, ANDERSON and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

The Bedding, Curtain and Drapery Workers Union, Local 140 of the United Furniture Workers of America, AFL-CIO, seeks review of an order of the National Labor Relations Board. The Board's decision and order, reported at 164 N.L.R.B. No. 27, found that Local 140 had violated section 8(b) (4) (ii) (B) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(b) (4) (ii) (B), by picketing three furniture stores with an object of forcing them to cease doing business with a bedding manufacturer. Upon a review of the record, we find that there is sufficient evidence to support the Board's findings and reject petitioner's other arguments against enforcement of the Board's order. Accordingly, we deny the union's petition and grant the Board's cross-petition for enforcement.

The retail stores in question are Modern Stores, Inc., Finkenberg Furniture Co., Inc., and Wucker Furniture Co.; all are located in New York City and sell various types of furniture, including bedding. The bedding manufacturer against whom the Board found the union's activities were directed is U. S. Mattress Corp., located in Irvington, New Jersey. In the fall of 1965, when the events complained of occurred, U. S. Mattress furnished seventy-five per cent of the bedding sold by Modern and supplied the other two stores as well. The production and maintenance employees of U. S. Mattress were represented by Teamsters Local 418, which had been certified by the Board in 1962 after an election in which petitioner Local 140 also appeared on the ballot. The Board's discussion of Local 140's activities embraced all three stores, but focused primarily on Modern; we turn directly to the events affecting it.

According to the evidence before the Board and its findings: On October 1, 1965, Enio Carrion, a Local 140 business agent, walked into Modern and inspected its supply of mattresses. When Mrs. Leiboff, one of Modern's owners, asked what he was looking for, Carrion told her that she carried "too much of U. S. Mattress." When Mrs. Leiboff pointed out that she also carried other brands, Carrion stated, "Well, U. S. doesn't be-

long to our union." Carrion then told Mrs. Leiboff the names of various manufacturers whose employees were represented by Local 140; Mrs. Leiboff pointed out that two of them were suppliers of Modern. Carrion replied, "you don't buy enough from Brooklyn firms." When Mrs. Leiboff bridled at this, Carrion said, "Well, all I can tell you is I am going to throw a picket line * * * *

[b]ecause I want you to buy more from the Brooklyn firms." He told Mrs. Leiboff to call Alex Sirota, the president of the Local, and left.

True to the business agent's word, about a week later two pickets appeared; they patrolled in front of Modern each day from 9:30 to 4:30 carrying signs with this legend:

APPEAL TO THE PUBLIC
PLEASE DO NOT BUY
NONUNION
FURNITURE
UPHOLSTERY & BEDDING
LOOK FOR THIS UNION LABEL
WHEN BUYING FURNITURE
UPHOLSTERY & BEDDING
[UFW LABEL]
UNITED FURNITURE WORKERS OF AMERICA
AFL–CIO

After the picketing began, Carrion returned. For the first time, he told Mrs. Leiboff that Modern's merchandise did not have union labels. She pointed out to him that even the bedding supplied by the two Local 140 shops had no such label. While Carrion was just outside the store, Mrs. Leiboff called one of these suppliers to request union labels. The latter suggested that Carrion be put on the phone; however, Carrion refused to come back into the store and talk to him.

After two weeks of picketing, Sol Portnoy, Mrs. Leiboff's partner, spoke to Sirota, the president of Local 140. Sirota explained that Modern was being picketed "because of the non-union shops." Actually, all of Modern's four suppliers of bedding had contracts with unions: two of them with Local 140, as Carrion had been told, the third with another local of United Furniture Workers of America, Local 140's parent body, and the last (U. S. Mattress) with a Teamster local, as indicated above. Port-

noy asked how long Modern would be picketed; Sirota replied that "it could be two weeks, two months or two years." Portnoy got the message and said that if "buying from FW [furniture workers] shops is what we had to do to rid ourselves of the pickets," he would follow that course. Thereafter, even though U. S. Mattress was its major supplier of bedding, Modern stopped buying from it. About a week later, the picketing in front of Modern stopped.

The picketing at the other two stores, Wucker and Finkenberg, took place in early November. Except for bedding produced by U. S. Mattress and one minor item of merchandise,[1] all the bedding displayed at these stores was also manufactured by Local 140 or a sister local. The picketing at Wucker and Finkenberg began without prior warning or investigation; shortly after their owners promised to stop doing business with U. S. Mattress, the picketing stopped. At the Finkenberg store it did

1. A chair bed, but purchases of this item were minimal. Finkenberg also pur-chased some bedding from a self-employed individual.

resume several days later and continued for four or five days.

On November 9, 1965, U. S. Mattress filed an unfair labor practice charge against Local 140. In December 1965, the Regional Director petitioned the United States District Court for the Southern District of New York for a temporary injunction against Local 140, pursuant to section 10 (*l*) of the Act, 29 U.S.C. § 160(*l*). In March 1966, the relief sought was obtained from Judge Metzner.[2] Meanwhile, hearings were held before the Board on the complaint of the Regional Director; in April 1966, the trial examiner recommended dismissal of the complaint. However, Judge Metzner refused to reconsider his decision granting a temporary injunction because "The preliminary determination by the trial examiner does not afford the court the guidance and weight that a decision by the Board would."[3] Thereafter, the Board disagreed with the trial examiner; in May 1967, on the foregoing facts, it concluded that Local 140 had violated section 8(b) (4) (ii) (B) of the Act.

■ That section provides, in relevant part:

It shall be an unfair labor practice for a labor organization or its agents—

\* \* \* \* \* \*

(4) \* \* \* (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

\* \* \* \* \* \*

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing \* \* \*.

The section was part of the 1959 Landrum-Griffin amendments[4] to section 8(b) (4) of the Taft-Hartley Act.[5] The amendments were a continuation of congressional efforts to circumscribe union pressure on a neutral employer caught in the cross-fire of a dispute between the union and another employer. One of the principal targets of the Taft-Hartley Act had been the secondary boycott; a simple example of this complex concept, see Lesnick, The Gravamen of the Secondary Boycott, 62 Colum.L.Rev. 1363 (1962), occurs when a retailer (secondary employer) is compelled by a union to stop purchasing from a supplier (primary employer) with whom the union has a labor dispute. Although the 1947 Act did not define secondary boycott or even use the term, the "labyrinthine provisions" of section 8(b) (4) were designed to deal with it.[6] Thus, section 8(b) (4) (A) declared it to be an unfair labor practice for the union in the above example to "induce or encourage" the retailer's employees to strike when an object of such conduct was to force the retailer to stop doing business with the

2. McLeod v. Bedding, Curtain & Drapery Workers Union, Local 140, No. 65 Civ. 3788 (E.D.N.Y. Mar. 31, 1966).

3. McLeod v. Bedding, Curtain & Drapery Workers Union, Local 140, No. 65 Civ. 3788 (E.D.N.Y. May 3, 1966).

4. Labor-Management Reporting and Disclosure Act of 1959, § 704(a), 73 Stat. 542–543, 29 U.S.C. § 158(b) (4).

5. Labor-Management Relations Act, 1947, § 8(b) (4), 61 Stat. 141–142.

6. Aaron, The Labor-Management Reporting and Disclosure Act of 1959, 73 Harv. L.Rev. 1086, 1113 (1960).

supplier. However, major loopholes still remained; one was pressure directly against the retailer himself by "threats of labor trouble," rather than inducement of his employees to strike; the latter was prohibited by the Taft-Hartley Act but the former was not. See NLRB v. Fruit and Veg. Packers, etc., 377 U.S. 58, 64, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964); NLRB v. Business Mach. etc. Mechanics Board, 228 F.2d 553 (2d Cir. 1955), cert. denied, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483 (1956). To remedy this, the 1959 amendments added a new subsection (subparagraph 8(b)(4)(ii) quoted above), which makes it unlawful for a union to "threaten, coerce, or restrain" any person where "an object" of the union's conduct is "forcing or requiring" that person "to cease * * * dealing in the products of any other * * * manufacturer." Thus, the prior prohibition of persuasion of *employees* of a secondary employer was expanded to prohibit direct pressure on that *employer*, as well. In addition, Congress also added a proviso exempting "publicity, other than picketing" from the restrictions of section 8(b)(4), as amended.[7] These and other changes in 1959 were the product of a sharp struggle between competing interests in the legislative arena. See Cox, The Landrum-Griffin Amendments to the National Labor Relations Act, 44 Minn.L.Rev. 257 (1959). The resulting compromises created thorny problems of statutory construction,[8] at least one of which is raised here.

In applying the language of section 8(b)(4)(ii)(B) to this case, the Board faced two questions: Was "forcing or requiring" the three retail stores to stop dealing with U. S. Mattress "an object" of the union, and did the union by its conduct "threaten, coerce, or restrain" the stores? The Board answered these questions affirmatively, reversing the trial examiner on both issues.

As to the first, the Board found that the object of the picketing by Local 140 was "to force or require a cessation of business dealings with U. S. Mattress, which stood in the position *vis-a-vis* Respondent [Local 140] of a primary disputant * * *." The union claims that this finding was not supported by the evidence. It maintains that it had been engaged since 1962 with other unions in a city-wide program of consumer picketing solely to promote the sale of merchandise bearing the United Furniture Workers and related union labels, that the incidents at the three stores now involved were minor, and that the Board's emphasis upon them distorts the true picture. Thus, it points out that there was picketing at other multi-product retail stores, and had witnesses from those stores been called.[9] it would have been clear that the union's conduct was not directed at U. S. Mattress, except incidentally. But as we have pointed out before, NLRB v. Suffolk County District Council of Carpenters, 387 F.2d 170 (2d Cir. 1967); NLRB v. Local 182, IBT etc., 314 F.2d 53, 58 (2d Cir. 1963), whether the union's conduct had an improper "object" is a question of fact; moreover, that "object" need not be the only one. See also NLRB v. Milk Drivers

---

7. That proviso reads:

   That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed

by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any service, at the establishment of the employer engaged in such distribution.

8. See, e. g., Note, Picketing and Publicity Under Section 8(b)(4) of the LMRA 73 Yale L.J. 1265, 1267 n. 16 (1964).

9. Local 140 implies that the Board should have called these witnesses.

Local 584, 341 F.2d 29, 32 (2d Cir.), cert. denied, 382 U.S. 816, 86 S.Ct. 39, 15 L.Ed. 2d 64 (1965). As with all questions of fact, the context in which the viewer chooses to resolve the issue is frequently determinative; if the substantial evidence test is met, however, we are not free to displace that point of view, even though we might not have reached the same factual conclusion ourselves. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). In support of its finding and in response to the argument that the picketing was only to educate the public to look for a union label, the Board said:

> Quite clearly, Respondent [Local 140] had no economic interest in conducting a consumer boycott of products made by its own members. Respondent was aware when it engaged in the picketing that bedding manufactured in its own unionized shops was shipped without union labels. It knew from its own investigation of Modern before it picketed that store that, except for some U. S. Mattress merchandise, all bedding carried by that store was produced in its own organized shops. It was in a position to know that substantially the same was true of Wucker and Finkenberg. The singular unwillingness of its business agent, when so requested by Modern, to so much as speak to one of its organized manufacturers concerning the absence of union labels on the products markedly points up that enforcement of its union label requirements, as such, could not have been the true object of its concern.

On the contrary, Respondent's entire course of conduct was such as to leave little doubt—and we so find—that the real object of its concern was with the retailers' handling of bedding from suppliers not under contract with it, specifically U. S. Mattress, and that the target of its picketing was to force a cessation of business dealings between the picketed retailers and such "non-union" manufacturers. This, we are convinced, is abundantly demonstrated by the following: (a) Respondent's business agent's initial complaint to Modern that Modern "carried too much U. S. Mattress"; (b) his accompanying explanation that "U. S. Mattress does not belong to our Union"; (c) Respondent's explanation for the picketing of Modern during its course, that it was because Modern was "carrying non-union brand merchandise"; and (d) the fact that the picketing of each retailer ceased shortly after it had promised to discontinue its purchases of U. S. Mattress products.

Local 140 offers various other reasons why these conclusions were unjustified. Thus, it points out that if its conduct had really been aimed at U. S. Mattress, it would have asked consumers specifically not to buy U. S. Mattress products on the signs carried by the pickets. It argues that such a sign would have been proper under the then recent decision of the Supreme Court in NLRB v. Fruit Packers etc., 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed. 2d 129 (1964) (hereafter referred to as "*Tree Fruits*" and discussed below). Therefore, according to Local 140, the Board attributed to it an irrational intention to choose a devious, ineffective and illegal method of accomplishing its purpose of injuring U. S. Mattress economically when it could have done so directly, effectively and legally. However, there are reasons why the Board's finding is not undermined by this argument. *Tree Fruits* was decided in 1964; the union claims that its city-wide campaign began in 1962. It is not at all improbable that the effects and complex teachings of *Tree Fruits* had not yet trickled down by October 1965 to the non-lawyers supervising or participating in picket lines. Moreover, much more economic pressure is brought upon a secondary retail employer by a generally worded picket sign than by a specific request to the public not to buy a particular product. In fact, as we point out below, this distinction forms, the basis of the decision in *Tree Fruits*. We have considered all of Local 140's able arguments on this point,

but we are not free to ignore the substantial evidence for the Board's finding as to "an object" of the union's picketing.

The more difficult problem in the case is whether the union's conduct amounted to unlawful restraint and coercion. Local 140 argues that it cannot be so characterized under the decision of the Supreme Court in *Tree Fruits*. In that case, a union went on strike against various fruit packers and warehousemen; the struck firms sold Washington State apples to the Safeway chain of retail stores. The union picketed the stores, appealing to consumers by picket signs and distribution of handbills. The placards stated:

> To the Consumer: Non-Union Washington State apples are being sold at this store. Please do not purchase such apples. Thank you. Teamsters Local 760, Yakima, Washington.

The handbills expanded upon this exhortation; they also made clear that there was a labor dispute with the many firms that packed the apples, but that it was "not a strike against any store or market." [10] No appeal was made to employees, nor was there any interference with deliveries; in addition, the pickets were forbidden to request customers not to patronize the store. The Board found that the union had violated the Act; it construed the 1959 amendments as banning all secondary consumer picketing.[11] However, the court of appeals refused to enforce the Board's order. Troubled by the constitutionality of the Board's broad reading of the statute, the court remanded for a finding as to whether the picketing had actually "coerced" the stores.[12] The Supreme Court, hearing the Board's appeal, was also concerned "that a broad ban against peaceful picketing might collide with the guarantees of the First Amendment." In setting aside the Board's order, it distinguished between a secondary appeal to consumers not to trade at all at a retail store and an appeal not to buy a particular product sold there. The Court held that picketing conveying the latter message is not outlawed by section 8(b) (4) (ii) (B), even though it is literally within its terms, since it is not truly coercive (377 U.S. at 71–72, 84 S. Ct. at 1071):

> We come then to the question whether the picketing in this case, confined as it was to persuading customers to cease buying the product of the primary employer, falls within the area of secondary consumer picketing which Congress did clearly indicate its intention to prohibit under § 8(b) (4) (ii). We hold that it did not fall within that area, and therefore did not "threaten,

---

10. A typical handbill read:

DON'T BUY
WASHINGTON STATE
APPLES

THE 1960 CROP OF WASHINGTON STATE APPLES IS BEING PACKED BY NON-UNION FIRMS
Included in this non-union operation are twenty-six firms in the Yakima Valley with which there is a labor dispute. These firms are charged with being

UNFAIR

by their employees who, with their union, are on strike and have been *replaced by non-union strikebreaking workers* employed under substandard wage scales and working conditions.

In justice to these striking union workers who are attempting to protect their living standards and their right to engage in good-faith collective bargaining, we request that you

DON'T BUY
WASHINGTON STATE
APPLES

TEAMSTERS UNION LOCAL 760
YAKIMA, WASHINGTON

This is not a strike against any store or market.

(P.S.—PACIFIC FRUIT & PRODUCE CO. is the only firm packing Washington State Apples under a union contract.)

11. 132 N.L.R.B. 1172, 1177 (1961). The Board relied on its earlier decision in Upholsterers Frame & Bedding Workers, 132 N.L.R.B. 40, 43–45 (1961), enforcement denied (after the intervening Supreme Court decision in *Tree Fruits*), 331 F.2d 561 (8th Cir. 1964).

12. Fruit and Veg. Packers & Warehouse Local 760 v. N.L.R.B., 308 F.2d 311 (D.C. Cir. 1962).

coerce, or restrain" Safeway. While any diminution in Safeway's purchases of apples due to a drop in consumer demand might be said to be a result which causes respondents' picketing to fall literally within the statutory prohibition, "it is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." * * * When consumer picketing is employed only to persuade customers not to buy the struck product, the union's appeal is closely confined to the primary dispute. The site of the appeal is expanded to include the premises of the secondary employer, but if the appeal succeeds, the secondary employer's purchases from the struck firms are decreased only because the public has diminished its purchases of the struck product. On the other hand, when consumer picketing is employed to persuade customers not to trade at all with the secondary employer, the latter stops buying the struck product, not because of a falling demand, but in response to pressure designed to inflict injury on his business generally. In such case, the union does more than merely follow the struck product; it creates a separate dispute with the secondary employer. [Footnote omitted.]

The Court emphasized the contrast as follows (id. at 70, 84 S.Ct. at 1070):

> Peaceful consumer picketing to shut off all trade with the secondary employer unless he aids the union in its dispute with the primary employer, is poles apart from such picketing which only persuades his customers not to buy the struck product.[13]

■■ Local 140 claims that the activity proscribed by the Board in this case was "product picketing of non-union goods," fully protected by the rationale of *Tree Fruits*. The Board disagreed, reasoning that the picketing here "was aimed at inducing a generalized loss of patronage." While the issue is a close one, we find sufficient support for the Board's conclusion. The Board found that U. S. Mattress was an object of the union's activity—a finding which we have concluded must stand. Yet the picket signs did not specify that company or its product in the message to consumers. Local 140 argues that it "described the goods in the only way possible on a placard. It asked the public to look for its label * * *." But the inaccuracy of that assertion is indicated even by the cases relied on by Local 140; e. g., in Big Apple Supermarkets, Inc. v. Dutto, 237 F.Supp. 774 (E.D.N.Y.1965), the pickets apparently specifically requested customers not to buy the goods of Gourmet Company, and in NLRB v. Upholsterers Frame & Bedding Workers, 331 F.2d 561 (8th Cir. 1964), the picketing union passed out leaflets which stated the names of local manufacturers whose products consumers should buy.[14] Moreover, the appeal to look for the label was not specific enough in identifying the boycotted product or company. The record shows that lack of a label at these stores did not indicate non-union merchandise, which fact Local 140 clearly knew at least as to Modern. Finally, the signs asked customers not to buy non-union "furniture, upholstery & bedding," a far broader appeal than required to boycott the products of U. S. Mattress, a bedding manufacturer only. We conclude that the consumer picketing here failed to isolate

13. Three members of the Court could not find in the statute's prohibition of conduct aimed at the secondary employer "the fine distinction * * * between general and limited product picketing." 377 U.S. at 82, 84 S.Ct. at 1076 (dissent of Harlan, J., joined by Stewart, J.). Justice Black agreed with the construction of the dissenters; however, he felt that the statute so read was unconstitutional. Justice Douglas did not participate in the decision.

14. The case was decided by the Board prior to *Tree Fruits;* the court of appeals correctly concluded that the Board's proscription of all peaceful secondary picketing was, under that decision, erroneous.

the dispute and was thus closer to an appeal "to shut off all trade with the secondary employer" than to picketing "which only persuades his customers not to buy the struck product." Therefore, under the teaching of *Tree Fruits*, Local 140 did "threaten, coerce or restrain" the three retail stores here involved. Cf. NLRB v. Millmen & Cabinet Makers Union, Local 550, 367 F.2d 953 (9th Cir. 1966); NLRB v. Building Service Employees Union, Local 105, 367 F.2d 227 (10th Cir. 1966). See also NLRB v. Local 25, IBEW, 383 F.2d 449 (2d Cir. 1967). We emphasize that we do not have here merely picketing to educate consumers to buy union-label merchandise. The Board, supported by substantial evidence, has found that the picketing had a different object, and we must accept that characterization. Therefore, we need not rule whether "union-label" secondary picketing alone could be held improper under the Act.[15] For the same reason, we also need not decide whether picketing these retailers would be a secondary boycott proscribed by the statute if its sole object was to protect the jobs of members of Local 140 in other manufacturing plants. Cf. National Woodwork Manufacturers Ass'n v. NLRB, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); Lesnick, Job Security and Secondary Boycotts: The Reach of NLRA §§ 8(b) (4) and 8(e), 113 U.Pa.L.Rev. 1000 (1965). Such inquiries would raise fine—perhaps esoteric—distinctions with which we need not now deal.

■ Local 140's final argument is that the Board's order is an unconstitutional abridgement of its First Amendment rights. The distinction in the *Tree Fruits* opinion, otherwise relied on by the union, supplies the answer to that contention. While "a broad ban against peaceful picketing" might be unconstitutional, it was proper for Congress to deal with the "isolated evil" of

> peaceful consumer picketing at secondary sites * * * to persuade the customers of the secondary employer to cease trading with him in order to force him to cease dealing with, or to put pressure upon, the primary employer. This narrow focus reflects the difference between such conduct, and peaceful picketing at the secondary site directed only at the struck product.[16]

While perhaps the latter cannot constitutionally be prohibited, the former can. See National Maritime Union v. NLRB, 342 F.2d 538, 546 (2d Cir.), cert. denied, 382 U.S. 835, 86 S.Ct. 78, 15 L.Ed.2d 346 (1965); cf. Int'l Bhd. of Elec. Workers v. NLRB, 341 U.S. 694, 705, 71 S.Ct. 954, 95 L.Ed. 1299 (1951).[17] And the Board has justifiably concluded that here we have that type of picketing.

Accordingly, the union's petition for review is denied, and the Board's cross-petition to enforce is granted.

IRVING R. KAUFMAN, Circuit Judge (dissenting):

I find that I cannot concur in my brother Feinberg's interesting opinion. I would have less difficulty comprehending the thrust of the majority's opinion had it explained N. L. R. B. v. Fruit Packers (Tree Fruits), 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964), as being limited to instances where the picketing publicizes a grievance in a dispute between a union and a primary employer;[1] or that consumer picketing would

---

15. The Board also stated that this question was not before it on this record.

16. 377 U.S. at 63, 84 S.Ct. at 1063.

17. Cf. Cox, Strikes, Picketing and the Constitution, 4 Vanderbilt L.Rev. 574, 591–602 (1951).

1. Unlike the union in *Tree Fruits*, Local 140 is not striking against any primary employer. Local 140 lost a representation election at U. S. Mattress in March 1962 —3½ years before the picketing in this case—but the record is wholly devoid of any suggestion that it is now seeking to represent U. S. Mattress' employees who are affiliated with another union.

be legal only if it was connected with such a dispute and did not seek to persuade potential customers to boycott the *entire* secondary enterprise. Such an interpretation of *Tree Fruits* might find some sanction in the Supreme Court's emphasis that the picketing in *Tree Fruits* was merely an extension of the primary dispute—where it was clearly legal—to a secondary situs, id. at 72, 84 S.Ct. 1063 but it would not reflect the Court's "concern that a broad ban against peaceful picketing might collide with the guarantees of the First Amendment." Id. at 63, 84 S.Ct. at 1066. Compare Justice Black's concurring opinion, id. at 76, 84 S.Ct. 1063. In light of the Supreme Court's exegesis of the legislative history of section 8(b) (4) (ii) (B) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(b) (4) (ii) (B), I consider it settled that the Board cannot enforce a ban against picketing that might conflict with the right of free speech unless there is the "clearest indication," N. L. R. B. v. Drivers Local Union, 362 U.S. 274, 284, 80 S.Ct. 706, 4 L.Ed.2d 710 (1960), that the picketing was part of the "isolated evil" that Congress wished to suppress. In the absence of a more explicit Congressional policy, I can only conclude, as did the Trial Examiner in this case, that there is "no reason to hold that a union may picket to persuade the public not to buy a struck product but not to persuade it not to buy non-union made products." [2] See N. L. R. B. v. Upholsterers, Frame & Bed. Wkrs., 331 F.2d 561 (8th Cir. 1964) (consumer picketing to encourage the sale of locally manufactured union made products); cf. Big Apple Supermarkets, Inc. v. Dutto, 237 F.Supp. 774 (E.D.N.Y. 1965). Indeed, the majority insists that it does not decide today that "picketing to educate consumers to buy union-label merchandise" runs afoul of the Act. But, I fear that under the familiar rubric of applying the "substantial evidence" doc-

trine that is precisely what the majority has done; the effect of the decision is to hold such picketing illegal where, as here, it takes place at a retailer whose primary supplier is non-union.

On their face, the signs carried by Local 140 were clearly designed to do what the majority refuses to condemn as illegal—to induce the public to purchase union made products. Nevertheless, my brothers uphold the Board's "findings" that the object of the picketing was "to force or require a cessation of business dealings [by the retailers] with U. S. Mattress" and that the manner of picketing amounted to unlawful restraint and coercion because it was "designed to inflict injury on [the retailers'] business generally." I find the logic of this reasoning difficult to accept.

Whatever evidence there is to support the Board's characterization of the union's objective is at best meagre even when considered in light of the "substantial evidence" doctrine of Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). There is absolutely nothing in the record to rebut the union's contention that the challenged picketing was merely one segment of a citywide campaign—in conjunction with allied locals of the United Furniture Workers of America, AFL–CIO—to increase the display and sale of *union produced merchandise.* Nor is there any response in the record to the Local's evidence that the target stores were selected more or less at random and included department stores and furniture retailers who sold the goods of many manufacturers. Moreover, it is not of little significance that the Trial Examiner, who alone had the opportunity to observe the demeanor of the witness and to appraise the sincerity of the union's proclaimed objective, see N. L. R. B. v. Local 3, Bloomingdale, etc., 216 F.2d 285 (2d Cir. 1954), concluded that there was no evi-

---

**2.** Utilizing the terminology adopted in the proceedings below, goods produced by other unions as well as those produced by non-union workers will be referred to as "non-union."

dence that the union officials did more than make clear that they wanted the stores to carry more union produced merchandise.

More basic, however, is my difficulty in acquiescing in the majority's uncritical acceptance of the Board's statement that:

enforcement of its [Local 140's] union label requirements, as such, could not have been the true object of its concern. * * * the real object of its concern was with the retailers' handling of bedding from suppliers not under contract with it, specifically U. S. Mattress, and that the target of its picketing was to force a cessation of business dealings between the picketed retailers and such "non-union" manufacturers.

The significance and purport of the Board's language "union label requirements, as such" is obscure, but certainly it would be fatuous to argue that the union was merely seeking assurance that each item produced by a union shop bore a union label; such an objective could more easily be enforced at the manufacturer's plant.[3] The union's mission obviously was broader. The picket signs in bold type stated "Appeal to the public, please do not buy nonunion furniture, upholstery and bedding—Look for the union label." Although the majority professes not to hold that "picketing to educate consumers to buy union-label merchandise" is illegal, it would appear that no meaningful distinction can be drawn between such picketing and picketing whose "real object * * * [is] with the retailer's handling of bedding from suppliers not under [union] contract."

It seems implausible and a bit hairsplitting not to recognize that since it is a fair assumption that the public's demand for bedding is not insatiable, requesting customers to purchase more union produced products is the practical equivalent to asking them to buy less from non-union manufacturers. In this case, U. S. Mattress was the only significant non-union manufacturer carried by Modern; it supplied 75 per cent of the store's total bedding.[4] Thus, when consumers were requested to purchase more union (and less non-union) products, they were in reality being asked to buy less from U. S. Mattress.[5] It would seem to follow, therefore, that the Board's characterization of the Local's objective (to force a cessation of dealings with U. S. Mattress) does not serve to specify one objective to the exclusion of all other objectives. In this case, the union could not possibly achieve its goal to have the public purchase more union produced goods without of necessity asking it to buy less from U. S. Mattress. The effect of the court's decision, therefore, is to put a premium on circumlocution.

The majority holds that the union's picketing is not protected by the rationale of *Tree Fruits* because "[t]he Board found that U. S. Mattress was an object of the union's activity * * * [y]et the picket signs did not specify that company or its products in the message to consumers."[6] And, while the majority

3. Local 140's contract with the union shops that supplied the 3 retailers required the union label on all goods.

4. The record does not indicate what percentage of bedding U. S. Mattress supplied to the other stores. But Sidney Wucker, a partner in Wucker Furniture Company, testified that U. S. Mattress was their "prime source." And Nat Radelman, the president of Finkenberg's Furniture Company, upon advice of counsel refused to state how much he purchased from U. S. Mattress. It is clear, however, that U. S. Mattress was his major supplier.

5. When viewed in this context, the sparse and ambiguous references to U. S. Mattress by union officials are appropriately seen as another way of stating its case against non-union producers.

6. The majority also reasons that the picketing was outside the rationale of *Tree Fruits* because Local 140 clearly knew, at least as to Modern, that the lack of a union label did not indicate non-union merchandise. The signs, therefore, it is argued, could only be calculated to cause a generalized loss of patronage. But any store could easily obtain union labels from

finds the issue "close," it decides that there is sufficient support for the Board's conclusion that the picketing was "aimed at inducing a generalized loss of patronage" by the three retailers. The Board's conclusion on this issue is reached by a tortuous route. It first attributed to the union an objective it denied (to force a cessation of dealings with U. S. Mattress), and then proceeded to fault the union for picketing with signs that did not reflect this alleged intent. The speciousness of the Board's decision is apparent when one considers its willingness to assume, for purposes of this case, that the picketing would have been within the covering shade of *Tree Fruits'* branches if U. S. Mattress had been specifically identified *nomine* on the signs. Whether or not the complex teachings of *Tree Fruits* had trickled down to the non-lawyers on the picket line (one may query who determines the terminology of signs in a highly organized campaign), it is odd to suggest that Local 140 went astray by stating on its signs an objective (buy more union goods) which my brothers refuse to hold violates the Act. The union is charged and faulted with attempting to accomplish by indirection that which it could have achieved directly.

In sum, I believe that in this case there is no reason to question that the picket signs correctly reflected the union's objective—to induce consumers to purchase more union-made products. A good deal can be said against the wisdom of subjecting retailers to what must realistically be seen as the pressure brought to bear by Local 140. But, if *Tree Fruits* has vitality, such consumer picketing is a legitimate exercise of persuasion by the union. I would set aside the Board's order.

the union manufacturers they carried. See fn. 3 supra. Indeed, that is precisely what Modern did, placing the labels in its show window to counter the effect of the picketing. I attach little significance to the fact that the signs specified "furniture, upholstery and bedding" rather than only bedding. As noted above, the picketing was part of a concerted campaign by allied locals of the United Furniture Workers of America. I know no rule of law that prevents different locals of the same union from cooperating in this fashion. In any event, I fail to see how the 3 retailers would be benefited (or how the question before us would be meaningfully different) if members of all the locals showed up, one carrying a picket specifying "bedding," another "upholstery," and a third "furniture."