**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**
and
**New York Telephone Company,
Intervenor,**

v.

**LOCAL UNION NO. 3, INTERNATION-
AL BROTHERHOOD OF ELECTRICAL
WORKERS, AFL–CIO,** Respondent.

No. 528, Docket 72–1921.

United States Court of Appeals,
Second Circuit.

Argued March 19, 1973.

Decided April 10, 1973.

Rehearing Denied June 13, 1973.

Edward N. Bomsey, Atty., NLRB, Washington, D. C. (Peter G. Nash, Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Robert A. Giannasi, Atty., NLRB, Washington, D. C., of counsel), for petitioner.

Saul G. Kramer, New York City (Proskauer, Rose, Goetz & Mendelsohn, Edward Silver, Charles R. Held, G. Wallace Bates and William P. Witman, New York Telephone Company, New York City, of counsel), for intervenor.

Norman Rothfeld, New York City (Harold Stern, New York City, of counsel), for respondent.

Before SMITH, FEINBERG and MANSFIELD, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

The National Labor Relations Board has petitioned for enforcement of an order against Local Union # 3, International Brotherhood of Electrical Workers, (the "Union") to cease and desist from violations of the secondary boycott provisions of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(i) and (ii)(B). The Board's decision, adopting the findings, conclusions, and order of the Trial Examiner, appears at 197 NLRB No. 59, 80 LRRM 1630 (1972). We find substantial evidence in the record to support the order, and enforce.

The underlying facts are not in dispute. New York Telephone Company ("Telco") has for many years subcontracted the jobs of installing telephone wire and cables and fastening certain iron work and terminals in buildings under construction or major alteration to independent contractors. Telco contracted with L. K. Comstock and Co. ("Comstock"), Lord Electric Co. ("Lord"), and J. Livingston and Co. ("Livingston") to do such work on a number of Manhattan jobsites. The employees of these contractors were represented by Local # 3. Under the usual procedure, the material used by the contractor was delivered to the jobsite by Telco employees, who unloaded it from the trucks. The Local #3 members then would transfer the material to the point of use, and install it.

In July of 1971, Telco employees, represented by the Communications Workers of America ("CWA"), went out on strike. Consequently, Telco management personnel were assigned the delivery jobs outlined above. At least during the period prior to August 31, 1971, these

deliveries were accepted by the contractors' employees and installed, although there were apparently one or two instances in which Union members refused to accept or place the materials.

On August 31, a luncheon meeting took place between Thomas Van Arsdale, the Union business manager, Peter J. McCall, a Telco representative, Anthony Salerno, Comstock's telephone superintendent, and John Fenley, Lord's general superintendent.[1] The instances of non-acceptance of Telco deliveries were discussed. There was a conflict of testimony as to whether Van Arsdale stated that Union members had been instructed not to accept such deliveries, or whether he merely said that such actions were individual acts of conscience on the part of Local # 3 members. The Trial Examiner found it unnecessary to rely upon what was said at the meeting, and did not resolve the dispute.

Telco then contracted with independent truckers to deliver the materials to the jobsites; several such deliveries were accepted. On about September 7, however, a telephone conversation took place between Fenley and McCall. McCall was told that Fenley and Salerno had met with Van Arsdale, who informed them that the new delivery arrangement might also lead to difficulties. Again, it was a matter of dispute —which the Trial Examiner did not find it necessary to resolve—whether Van Arsdale stated that Union members had been instructed to refuse deliveries, or whether he simply reported the possibility.

On September 9, Local # 3 held its regular monthly membership meeting. In the course of his business report, Van Arsdale discussed the Telco situation, and told the membership that it was his view that when Telco management or independent truckers delivered materials to jobsites, they were acting as strikebreakers. He further stated that "if we were . . . to be true to the trade union principles, that there . . .

would be no basis for men working under those circumstances." Van Arsdale emphasized, however, that this was his personal view and that others would have to make up their own minds. Van Arsdale had also made these views known in a number of individual discussions with Local # 3 members.

On September 10, a meeting took place between McCall and Van Arsdale. McCall told Van Arsdale that Telco was taking a serious view of any refusals to accept deliveries, and might either bring court action or eliminate the subcontracting system entirely, leaving the installation work to be done by Telco employees. McCall testified that Van Arsdale "said he was sorry but they had taken a Trade Union stand that they could not be in a position of aiding or abetting strike breakers; that he considered such work, such material, deliveries to be strike breaking."

At about the same time, a number of interruptions began to occur on Manhattan projects. On September 9, employees of Comstock on a job at 94th and Park Avenue, and employees of Lord at a job on Madison Avenue, refused to install wire and cable. On September 10, a Livingston foreman, a member of Local # 3, refused to do a job at One Liberty Plaza involving deliveries by management personnel. On the same day, Livingston employees at 1409 Broadway refused to accept deliveries from "strikebreakers." On September 17, Livingston electricians at 919 Third Avenue refused to install material delivered by Telco personnel.

On September 21, Telco filed unfair labor practice charges against the Union. Pursuant to § 10(l) of the Act, 29 U.S.C. § 160(l), the Board's Regional Director sought a temporary restraining order against the Union's work interruptions. Such an order was issued by the District Court for the Southern District of New York on October 20, 1971. F. Supp., 80 LRRM 2436.

---

1. Fenley was also a vice-president of Local Union # 3.

On October 22, Comstock employees refused to install material at the 450 Park Avenue and 94th and Park Avenue jobsites. The District Court then granted a preliminary injunction on October 28, 1971. F.Supp., 80 LRRM 2557. On December 29, 1971, the District Court found the Union in civil contempt and directed it to purge itself. 337 F.Supp. 31 (S.D.N.Y.1971).

## I.

■ *Inter alia*, § 8(b)(4) of the National Labor Relations Act makes it an unfair labor practice for a union

"(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

\* \* \* \* \* \*

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person. . . ."

The overriding purpose of these secondary boycott provisions is to protect "unoffending employers and others from pressures in controversies not their own." NLRB v. Denver Building Trades Council, 341 U.S. 675, 692, 71 S. Ct. 943, 953, 95 L.Ed. 1284 (1951). *See also* NLRB v. Local 825, Operating Engineers, 400 U.S. 297, 302–303, 91 S.Ct. 402, 27 L.Ed.2d 398 (1971).

■. Here, it is clear that Local # 3 members employed by neutral contractors refused to deliver or install materials delivered by other than striking Telco workers. The real question is one of fact—did the Union "induce or encourage" such refusals? And, it is a settled principle that this court should accept those findings of fact made by the Board which are supported by substantial evidence, even if we might have reached a different conclusion ourselves. *See, e. g.,* Bedding, Curtain and Drapery Workers Union, Local 140 v. NLRB, 390 F.2d 495, 499–500 (2d Cir. 1967), cert. denied, 392 U.S. 905, 88 S.Ct. 2056, 20 L.Ed.2d 1363 (1968).

The Union contends that Van Arsdale's statements at the September 9 meeting represented only his own personal views, that Union members were explicitly told that they had to make up their own minds, and that no "inducement or encouragement" under § 8(b)(4) could therefore have taken place. But, we have been told by the Supreme Court that "The words 'induce or encourage' are broad enough to include in them every form of influence and persuasion." International Brotherhood of Electrical Workers v. NLRB, 341 U.S. 694, 701–702, 71 S.Ct. 954, 958, 95 L.Ed. 1299 (1951). Or, in the more colorful words of Judge Goldsborough, "If a nod or a wink or a code was used in place of the word 'strike,' there was just as much a strike called as if the word 'strike' had been used." United States v. United Mine Workers, 77 F. Supp. 563, 566 (D.D.C.1948), aff'd, 85 U.S.App.D.C. 149, 177 F.2d 29, cert. denied, 338 U.S. 871, 70 S.Ct. 140, 94 L. Ed. 535 (1949).

■ There was substantial evidence in the record from which the Board could conclude that Van Arsdale's remarks constituted the inducement or encouragement prohibited by § 8(b)(4)(i)(B). Van Arsdale was the business manager of the Union, solely responsible for results in the field, who stated at an official meeting that his interpretation of trade union principles required the refusal to handle Telco deliveries. Soon following were a number of

such refusals. While it may have been theoretically possible for a Union member to view Van Arsdale's statements as solely personal, and not the official position of the Union, the exercise is difficult at best. Indeed, Van Arsdale himself seems to have recognized this, for after stating that he had made his views known to individual members on several occasions, the following colloquy occurred:

"Q. Mr. Van Arsdale, focusing on the period between August 31st and October 19th—that's the period prior to the injunction, did you express your views to the members of Local 3 concerning whether they should or should not do the work?

Not the local's views, but yours?

A. How do you distinguish between the local's views and my views?"

The Board was entitled to find that when Van Arsdale chose the official meeting to make his personal views known, he was "encouraging or inducing" action thereupon, even if the final choice were explicitly left up to Union members. This finding is corroborated by the fact that Union members who refused to handle Telco deliveries were not disciplined, despite the availability of sanctions in both the International Constitution and the Local Bylaws for those causing unauthorized work stoppages. See NLRB v. Local Union # 3, IBEW, 467 F.2d 1158, 1160 (2d Cir. 1972); Local Union # 25, IBEW, 162 NLRB 703, 719–720 (1967), enforced, 396 F.2d 591 (2d Cir. 1968); Local Union # 3, IBEW, 140 NLRB 729, 740 (1963), enforced, 325 F.2d 561 (2d Cir. 1963).

The facially equivocal nature of Van Arsdale's statements cannot in itself preclude the finding of a § 8(b)(4)(i)(B) violation. In NLRB v. Local 294, International Brotherhood of Teamsters, 298 F.2d 105, 106–107 (2d Cir. 1961), we held that a union's re-

quests for "cooperation" from firms and their employees dealing with a struck trucking concern amounted to a § 8(b) violation. We noted that given the circumstances at hand, such a request was tantamount to encouragement of a secondary boycott. Surely the Board could have found the same here. Similarly, in Truck Drivers and Helpers Local Union #728 v. NLRB, 332 F.2d 693 (5th Cir.), cert. denied, 379 U.S. 913, 85 S.Ct. 261, 13 L.Ed.2d 185 (1964), such statements by a union president as "I can't tell you anything. You do as you please. You don't have to handle no scab freight," and comments by stewards that they would not handle the disputed freight, but that others should make up their own minds were found to constitute § 8(b) inducement. See also NLRB v. District Council of Painters # 48, 340 F.2d 107 (9th Cir.), cert. denied, 381 U. S. 914, 85 S.Ct. 1539, 14 L.Ed.2d 435 (1965) (§ 8(b)(4) violation premised on statements by union representative that struck manufacturers' materials were "unfair").

Nor does the Trial Examiner's finding that Van Arsdale had no actual intent to induce or encourage the work stoppages take the statements outside of § 8(b)(4). It is enough that such inducement was the natural consequence of his statements; the Board's finding that work stoppages actually occurred as a result of the statements makes the proof of actual intent unnecessary. See NLRB v. Local 459, IUE, 228 F.2d 553, 560 (2d Cir. 1955), cert. denied, 351 U. S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483 (1956).

II.

The Union argues that even if Van Arsdale's statements are assumed to be "inducement or encouragement," a number of factors preclude the finding of § 8(b)(4) violations here. First the Union contends that the statements fall within the scope of § 8(c) of the Act, 29 U.S.C. § 158(c), which provides:

"(c) The expressing of any views, argument, or opinion, or the dis-

semination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

Alternatively, the Union argues that if § 8(b)(4) does reach the statements made by Van Arsdale here, it is unconstitutional because of its prohibition against pure speech.

Whatever merit these contentions might have in the abstract, they are disposed of by the Supreme Court's decision in IBEW v. NLRB, *supra*, 341 U.S. at 703–705, 71 S.Ct. 954. There, the Court held § 8(c) did not protect § 8(b)(4) inducements or encouragements, reasoning that such a construction would gut the effectiveness of the secondary boycott provisions. The Court directly rejected the position, urged by the Union here, that only those inducements and encouragements that amount to a "threat of reprisal or force or promise of benefit" fall within § 8(b)(4), holding instead that § 8(b)(4) reaches every form of influence and persuasion. *Id.* at 701–702, 71 S.Ct. at 959.

The same case also disposes of any First Amendment objections to § 8(b)(4), noting that "prohibition of inducement or encouragement of secondary pressure . . . carries no unconstitutional abridgement of free speech." *Id.* at 705, 71 S.Ct. at 960. And, while the Union is correct in noting that the inducement in the Supreme Court case involved picketing and not the "pure speech" presented here, that is a distinction without a difference. The Court noted that:

> "The remedial function of § 8(c) is to protect noncoercive speech by employer and labor organization alike in furtherance of a lawful object. It serves that purpose adequately without extending its protection to *speech or*

*picketing* in furtherance of unfair labor practices such as are defined in § 8(b)(4)." (Emphasis added)

*Id.* at 704, 71 S.Ct. at 960. It is thus clear that the Court which rejected First Amendment objections to § 8(b)(4) had "speech" as well as "picketing" inducements in mind.

■■ The Union next contends that, in view of the fact that the refusals to accept deliveries were few in absolute number and did not totally halt work on any project, no § 8(b)(4)(i) or (ii)(B) "cessation of business object" was shown. The argument is without merit. The Supreme Court has made it clear that the subsection (B) "cease doing business" requirement may be satisfied by something less than a total halting of operations by the neutral employer. NLRB v. Local 825, Operating Engineers, *supra*, 400 U.S. at 304–305, 91 S. Ct. 402. Bearing in mind that the issue of what was the object of any inducement or coercion is a factual question, *see* Bedding, Curtain and Drapery Workers Local 140 v. NLRB, *supra*, 390 F.2d at 499–500, we are unable to conclude that the Union's goal here was "so limited" or "the foreseeable consequences of its secondary pressure so slight," as to foreclose subsection (B) liability. NLRB v. Local 825, *supra*, 400 U.S. at 305, 91 S.Ct. at 407. *See, e. g.,* NLRB v. Local 830, International Brotherhood of Teamsters, 281 F.2d 319 (3d Cir. 1960) (eight instances of refusals to handle out of thousands of sales sufficient to uphold board findings). *Cf.* NLRB v. Local 802, Musicians, 226 F.2d 900, 904–905 (2d Cir. 1955) (even unsuccessful attempts at inducement within purview of secondary boycott provisions.)

■ Similarly, the stoppages were neither so isolated nor *de minimis* in scope so as to give us ground to disturb the Board's findings of a § 8(b)(4)(ii) threat, coercion, or restraint. We have held in a case involving many of the same parties that a work stoppage alone

(a number of which clearly occurred here) may constitute a § 8(b)(4)(ii) threat. NLRB v. Local # 3, IBEW, 325 F.2d 561, 562 (2d Cir. 1963). *See also,* NLRB v. Highway Truckdrivers & Helpers, Local No. 107, 300 F.2d 317 (3d Cir. 1962) (refusals to handle shipments found to constitute § 8(b)(4)(ii) threats.)

▆ Next, the Union argues that since the purpose of the secondary boycott provisions is to protect neutral employers from entanglement in labor disputes not their own, no § 8(b)(4) violation can be found in this case where Telco, not the contractors, was the charging party. We disagree. While § 8(b)(4) may be fairly characterized as a protection of neutral employers, Congress has nowhere indicated that charges must be initiated by the third party employer. Indeed, it is the neutral employer, subjected to secondary pressure by the offending union, who may most often be unwilling to go to the NLRB. As the Supreme Court has noted in another context, a "proceeding by the Board is not to adjudicate private rights but to effectuate a public policy." NLRB v. Marine Workers, 391 U.S. 418, 424, 88 S.Ct. 1717, 1721, 20 L.Ed.2d 706 (1968). Telco was neither a stranger to the conflict here, nor clearly without the "zone of interests" the National Labor Relations Act is designed to serve. Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). And, because enforcement of the Act depends "upon the initiative of individual persons," Nash v. Florida Industrial Commission, 389 U.S. 235, 238, 88 S.Ct. 362, 365, 19 L.Ed.2d 438 (1967), the Supreme Court has reminded us that "there should be as great a freedom to ask the Board for relief as there is to petition any other department of government for a redress of grievances." NLRB v. Marine Workers, *supra,* 391 U.S. at 424, 88 S.Ct. at 1722. In the absence of any authority to the contrary, we think it would be against this policy of private initiative and free

access to impose a restrictive requirement of standing to complain in § 8(b)(4) proceedings. *Cf.* Bedding, Curtain and Drapery Workers, Local 140 v. NLRB, *supra,* 390 F.2d at 498 (charging party was primary employer, not neutral employer).

### III.

In a final attempt to avoid the application of § 8(b)(4), the Union seeks to invoke two exceptions to the statutory coverage: the "struck work" doctrine and the § 8(b)(4) proviso. For the reasons outlined below, neither defense is applicable here.

▆ The "struck work" doctrine recognizes as a primary dispute, and thus without § 8(b)(4), the refusal of union members to do work, even at the site of a secondary employer, "which would otherwise be done by the striking employees of the primary employer." NLRB v. Local 459, IUE, *supra,* 228 F.2d at 559. The Union argues that the Board had, previous to the work stoppages here, ordered Local # 3 not to contest Telco's right to assign installation work to its own employees (Communications Workers of America) and that the Union was complying with the order. *See* 193 NLRB No. 116, 78 LRRM 1374 (1971) and 197 NLRB No. 137, 80 LRRM 1816 (1972). Thus, had it not been for the CWA strike, the Union argues, the installation work here would have been done by CWA members. Hence, the work is viewed as struck work, and § 8(b) inapplicable.

This argument fails for several reasons. First, the NLRB orders about giving installation work to CWA employees are by their own terms limited to projects in Queens. 193 NLRB No. 116 at n. 11, 78 LRRM at 1376 n. 11; 197 NLRB No. 137, 80 LRRM at 1816. There is simply no indication in either NLRB decision that the Manhattan installation work was to be given to CWA members, and thus it is impossible to view Local # 3 employees as doing work that but for the strike, CWA workers would have done.

■ Secondly, even if we assume *arguendo* that the installation work here might someday be assigned to CWA workers, the "struck work doctrine" remains inapplicable. It is clear from Judge Lumbard's opinion in NLRB v. Local 459, *supra*, that the doctrine allows union members to refuse to act as "strike-breakers," or put another way, refuses to treat as a secondary boycott the refusal to accept the "farmed-out work of a struck employer." 228 F.2d at 558. Here, the installation work done by Local # 3 members was performed by them for many years before the CWA strike, continued to be performed by them during the strike, and for all the record indicates, appears to have been still performed by them after the end of the strike. This is hardly the situation the "struck-work" doctrine was aimed at—Local # 3 members were clearly not being asked to act as strike-breakers in September and October of 1971.

■ The § 8(b)(4) proviso reads: *"Provided,* That nothing contained in this subsection [(b)] shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under [the Act]."

Thus, for the proviso to be applicable here, the Local # 3 members must be considered as *refusing to enter Telco premises* when they engaged in the work stoppages.

■ Such a characterization of the Union actions is absurd. It stretches credulity to call the construction projects here Telco premises; indeed, a rational analysis would seem to show that the construction sites were precisely the premises "of his own employer" that are without the proviso.[2] But even if we accept *arguendo* the shaky "premises" premise, the Union cannot seriously contend that its members "refused to enter" the construction sites. The Union itself recognizes this when it argues that the refusals to handle Telco materials, which were clearly made by workers *at* the jobsites, did not result in any real cessation of work. Whatever the merits of that contention—which we rejected as an attempt to avoid the subsection (B) "cessation of business object" requirement above—it is obvious that the Union could not even begin to so argue had the Local # 3 members refused to enter the construction sites. To read "refuse to enter" as "refuse to work" or "refuse to handle" would constitute a gross judicial rewriting of the proviso, which is designed to protect workers who refuse to cross primary picket lines at the premises of another employer, a situation clearly not present here. *Cf.* Truck Drivers Union Local No. 413 v. NLRB, 118 U.S.App.D.C. 149, 334 F.2d 539, 543 (D.C.Cir.), cert. denied, 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964).

## IV.

■ Finally, the Union argues that the Board's order is overly broad, since it prohibits the Union from engaging in prohibited conduct not only with respect to Telco and the contractors involved here, but with respect to "any other employer or person." While the order is broad, it is well settled that the Board has wide discretion in fashioning remedies. *See, e. g.,* International Association of Machinists v. NLRB, 311 U.S. 72, 82, 61 S.Ct. 83, 85 L.Ed. 50 (1940). In view of the long history of secondary pressures brought by Local # 3 against Telco, *see* NLRB v. Local # 3, *supra,* 467 F.2d 1158; NLRB v. Local # 3, 339

2. Even if we were to view Telco and the contractors as temporarily sharing a common situs at the jobsites, the holding of Grain Elevator, Flour & Feed Mill Workers, ILA, Local 418 v. NLRB, 126 U.S.

App.D.C. 219, 376 F.2d 774 (1967) would still make § 8(b)(4) applicable in the absence of on-site picketing by the primary union (CWA).

F.2d 145 (2d Cir. 1964); NLRB v. Local # 3, *supra*, 325 F.2d 561, and the fact that the Union has already been found in contempt of court for continuation of its secondary activities here, a broad order was an appropriate exercise of the Board's discretion. IBEW v. NLRB, *supra*, 341 U.S. at 706, 71 S.Ct. 954, 95 L.Ed. 1299.

Enforced.