**SHELL CHEMICAL COMPANY, a Division of Shell Oil Company, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 73–1399, 73–1401.**

United States Court of Appeals, Fifth Circuit.

June 14, 1974.

---

Vincent J. Apruzzese, Francis A. Mastro, Springfield, N. J., for petitioner.

Lawrence M. Cohen, Chicago, Ill., Otto F. Wenzler, Labor Relations Counsel, Chamber of Commerce of U. S. A., Washington, D. C., amicus curiae.

Elliott Moore, Deputy Associate Gen. Counsel, Stanley Zirkin, Glen M. Bendixsen, Chief of Spec. Litigation, N. L. R. B., Washington, D. C., Bernard L. Samoff, Reg. Director, Philadelphia, Pa., for respondent.

Robert F. O'Brien, Camden, N. J., for intervenor Teamsters Local 676 Union.

Before TUTTLE, GEWIN and RONEY, Circuit Judges.

TUTTLE, Circuit Judge:

These cases are before us on the petitions of Shell Chemical Company (Shell) to review two decisions by the National Labor Relations Board (Board). They stem from charges filed by Shell with the Board against Teamsters Local 676 for picketing and other conduct in violation of section 8(b)(4)(D) and section 8(b)(7) of the National Labor Relations Act (Act). Carried with the suit dealing with the section 8(b)(4)(D) charge, petition No. 73–1399, is a motion by the Board to dismiss the petition for want of jurisdiction.

## FACTS

Shell is a Delaware corporation engaged in the manufacture and non-retail sale of chemicals at its plant located in West Deptford, New Jersey. For the past ten years, Catalytic, Inc., (Catalytic) has performed maintenance services at Shell's plant. In connection with this work, Catalytic employed a truck driver named William Pollinger. Pollinger functioned primarily as a truck driver, transporting Catalytic personnel and equipment to the job site, and occasionally operated a forklift. During this time Catalytic was a party to a collective bargaining agreement with Local 676 of the Teamsters, of which Pollinger is a member. On December 9, 1971, Catalytic laid off eleven of its employees, including Pollinger, because Shell had increased the amount of maintenance work

done by its own employees and withdrawn from Catalytic the use of its truck and forklift which had been operated by Pollinger. Catalytic still employed fourteen or fifteen men at the Shell plant.

Subsequent to Pollinger's lay off and the return of the truck to Shell, Catalytic employees walked to the job site and equipment deliveries were handled by other means. The truck, which had been driven by Pollinger but which was owned by Shell, was driven by a number (approximately eight) of Shell employees, who handled maintenance support tasks involving the truck on an ad hoc basis. At no time after Pollinger's lay off did Shell employ anyone classified as a truck driver.

On December 13, 1971, Moses Jackson, Local 676 Business Agent, unsuccessfully protested Pollinger's lay off to Catalytic. Attempting a different tack, on December 21, Jackson wrote a letter to Shell which stated in part: "On behalf of Mr. Pollinger, we request that he be permitted to remain on the job performing his duties as before, and the terms of the Teamsters Local 676 agreement covering him be permitted to remain in effect." Shell replied suggesting that Local 676 direct its request that Pollinger be reinstated to Catalytic. Thereafter, on January 20, 1972, Local 676 set up a picket line and picketed the Shell plant for twenty-two days, ceasing on February 11. The pickets carried signs stating, "Shell unfair to William Pollinger/unfair to Teamster Local 676." Meanwhile, Local 676 had written, on January 26, Shell a letter stating it was not seeking *recognition* from Shell as Pollinger's bargaining representative, and added, "We simply request that you employ Mr. Pollinger under similar conditions with similar duties to those he enjoyed while employed by his former employer."

On February 9, 1972, the Board conducted an election at Shell's plant for a unit of production and maintenance employees, including those employees doing the maintenance formerly performed by the laid off Catalytic employees. This

election was held pursuant to a petition filed on December 22, 1971, (shortly after Catalytic had laid off eleven employees doing maintenance work at Shell's plant) by the Oil, Chemical and Atomic Workers International Union (OCAW). Teamsters Local 676 did not intervene or participate in any manner in that election. In June, 1972, OCAW was certified as the representative of the Shell employees. At no time has OCAW claimed assignment for its members of the truck driver job previously held by Pollinger. In fact no such particular job any longer existed.

On January 27, 1972, Shell filed charges alleging that Teamsters Local 676 had violated the Act, section 8(b)(4)(D),[1] by attempting to force Shell to assign work to Local 676 rather than to the employees represented by OCAW, and section 8(b)(7),[2] by picketing Shell with a *recognitional* object. In processing the section 8(b)(4)(D) charge, the Board instituted the prerequisite proceeding under section 10(k) of the Act.[3] The Board found that the object of Local 676 picketing was to gain reinstatement for Pollinger, and did not involve a contest with another union

over the work performed by Pollinger. Accordingly, the Board concluded that no *jurisdictional* dispute existed between the unions within the meaning of section 10(k) and quashed the notice of hearing under section 10(k). 199 N.L.R.B. No. 95 (1973). In their motion to dismiss, the Board asserts that the quashing of the notice of hearing is not reviewable under the Act, therefore denying jurisdiction to this Court. In the proceeding on the section 8(b)(7) charge, the Board concluded that the picketing by Local 676 did not have a recognitional object. Finding no violation of section 8(b)(7), the complaint was dismissed. Shell petitions for review.

SECTION 10(k) AND REVIEWABILITY

Except as authorized by statute, a court of appeals does not have jurisdiction to review actions of the Board. American Federation of Labor v. NLRB, 308 U.S. 401, 404, 60 S.Ct. 300, 84 L.Ed. 347 (1940). Section 10 of the Act, 29 U.S.C.A. § 160, is the sole provision vesting review with the courts of appeal. The Board argues, and the structure of the Act and case law support, that "order" as employed in sec-

---

1. Section 8(b)(4)(D), 29 U.S.C.A. § 158(b)(4)(D), provides, in pertinent part, that it "shall be an unfair labor practice for a labor organization or its agents: (4)(i) to engage in . . . or encourage a strike, . . . or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is:

   "(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work. . . ."

2. Section 8(b)(7), 29 U.S.C.A. § 158(b)(7), in relevant part, makes it an unfair labor practice for a union to picket an employer "where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representa-

tive of his employees . . . (C) where such picketing has been conducted without a petition under section 159(c) of this title being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing. . . ."

3. Section 10(k), 29 U.S.C.A. § 160(k), provides:

   "(k) Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed."

tions 10(e)[4] and section 10(f)[5] refer to an order issuing from an unfair labor practice proceeding. In section 10(c), which first utilizes the term "order," and in section 10(f), under which petitioner must establish the jurisdiction of this Court, the order referred to is clearly that resulting from the culmination of the procedure outlined in section 10(b) and (c), 29 U.S.C.A. § 160(b) and (c)[6], which involves either the dismissal of an unfair labor practice complaint or the granting of relief relating to an unfair labor practice. The courts of appeal have consistently viewed the Board's actions accepted for review in this framework.[7] In Laundry Workers v. NLRB, *supra*, 197 F.2d 701, where this Court specifically addressed the question of what constitutes a final order under section 10(f), we stated:[8]

"Agreeing with, we adopt as our own, the following from the brief of the Board:

'Under the decisions of the Supreme Court and the courts of appeals it has long been established that the phrase "a final order of the Board", as used in this section, refers solely to an order of the Board either dismissing a complaint in whole or in part or directing a remedy for the unfair labor practices found—in either case an order entered as the culmination of the procedure described in Section 10(b) and (c) of the Act.

'Accordingly, attempts to obtain review in the courts of appeals of Board action, short of an order issued at the completion of the procedure specified in 10(b) and (c), have uniformly failed. Thus, it has been held that 10(f) does not confer jurisdiction upon the courts of appeals: to review certifications, which the Board has either issued or declined to issue, at the conclusion of representation proceedings under Section 9; to review other Board decisions in representation proceedings, respecting such things as the holding of an election, the appropriateness of particular units, and the labor organizations eligible to appear on the ballot; or to review the Board's action in scheduling hearings in unfair labor practice cases.

'Similarly, it has been held that the action of the General Counsel, in dismissing an unfair labor prac-

---

4. This is the complement provision of section 10(f) which allows the Board to petition the court of appeals for enforcement of its "final orders."

5. Section 10(f) provides, in part:
   "Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such court a written petition praying that the order of the Board be modified or set aside. . . . Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e) of this section, and shall have the same jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing,

modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive."

6. These subsections outline the procedure for initiating and conducting the adjudication of an unfair labor practice complaint.

7. American Federation of Labor v. NLRB, *supra*, 308 U.S. at 405–408; Anthony v. NLRB, 204 F.2d 832 (6th Cir. 1953); Manhattan Construction Co. v. NLRB, 198 F.2d 320 (10th Cir. 1952); Laundry Workers v. NLRB, 197 F.2d 701 (5th Cir. 1952); General Drivers, Chauffeurs, and Helpers v. NLRB, 179 F.2d 492 (10th Cir. 1950); Lincourt v. NLRB, 170 F.2d 306 (1st Cir. 1948).

8. In *Laundry Workers*, the petitioner was seeking to review the Board's refusal to issue a subpoena *duces tecum* as a final order under section 10(f).

tice charge and declining to issue a complaint, is not a "final order" within Section 10(f), so that the courts of appeals are without jurisdiction to review such action'."

*Id.* at 703.

Since a section 10(k) proceeding is not the dismissal of a complaint of an unfair labor practice or the granting of relief, as provided in section 10(b) and (c), the quashing of the notice of a section 10(k) proceeding should not be considered a reviewable order under section 10(f).[9]

The legislative history of section 10(k) is not conclusive on this question, but does offer some support for denying review. When section 10(k) was added to the Act, Congress did not amend section 10(e) and (f) or indicate any intention to expand the term "final order." Congress, in fact, rejected a proposal which would have achieved this result. The Taft-Hartley Act, as originally drafted, provided only that a jurisdictional dispute was an unfair labor practice. Section 10(k) was added in the Senate Bill which required the appointment of arbitrators by the Board to determine any jurisdictional dispute. Their decision was to be given the status of "a final order of the Board." Sen.Rep.No.105, 80th Congress, 1st Sess.

at 40; I Legislative History of the Labor Management Relations Act of 1947, at 466 (1948). In a conference of the House and Senate committees, however, Congress decided not to employ the arbitration approach and. rejected these provisions.[10]

The purpose and structure of section 10(k) evince that Congress was providing for the resolution of jurisdictional disputes, labor organizations competing for the same work assignment, without the cumbersome, fault determining, and coercive process of an unfair labor practice proceeding under section 8(b)(4)(D).[11] The Supreme Court in NLRB v. Plasterers', etc., Union, 404 U. S. 116, 122 n. 10, 92 S.Ct. 360, 365, 30 L.Ed.2d 312 (1972), described the interaction of a section 10(k) proceeding with a section 8(b)(4)(D) unfair labor practice charge[12] :

"The § 10(k) determination is not binding as such even on the striking union. If that union continues to picket despite an adverse § 10(k) decision, the Board must prove the union guilty of a § 8(b)(4)(D) violation before a cease-and-desist order can issue. The findings and conclusions in a § 10(k) proceeding are not *res judicata* on the unfair labor practice issue in the later § 8(b)(4)(D), determina-

---

9. Manhattan Construction Company v. NLRB, *supra*, 198 F.2d 320; Trane Company v. NLRB, 68 L.R.R.M. 3024 (6th Cir. 1968) (per curiam granting of motion to dismiss) ; Rafel & Company v. Local 9, IBEW, 47 L.R.R.M. 2897 (7th Cir.), cert. denied, 366 U.S. 948, 81 S.Ct. 1902, 6 L.Ed.2d 1241 (1961) (per curiam granting of a motion to dismiss). *Cf.* Bricklayers, etc. v. NLRB, 155 U.S.App.D.C. 47, 475 F.2d 1316 (1973). *Contra*, Waterway Terminal Co. v. NLRB, 467 F.2d 1011 (9th Cir. 1972).

10. Although relevant, the elimination of the final order status of a section 10(k) proceeding can probably be attributed to a rejection of the arbitration approach rather than a concern with the issue of review. *Cf.* NLRB v. Radio, etc., Engineers, 364 U. S. 573, 581–582, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961).

11. Congress was seeking a no penalty resolution of jurisdictional disputes in order to protect employers and the public from be-

coming "the helpless victims of quarrels that do not concern them at all." H.R.Rep.No. 245, 80th Congress, 1st Sess. at 23, cited in NLRB v. Radio Engineers, *supra*, 364 U.S. at 581, n. 20. Or as phrased by the court in *Bricklayers, etc., supra*, 475 F.2d at 1320: "The threat to or coercion of the employer which gives rise to the charge of the unfair labor practice [section 8(b)(4)(D)] is sought by Congress through section 10(k) to be ended so that the work can proceed. Voluntary settlement is encouraged. If this does not eventuate, hope remains that the ensuing determination of the dispute by the Board will solve the matter."

12. This process is aptly illustrated by the procedural description in NLRB v. International Longshoremen's and Warehousemen's Union, 378 F.2d 33 (9th Cir. 1967), and NLRB v. Local 991, International Longshoremen's Association, 332 F.2d 66, 69–71 (5th Cir. 1964).

tion. International Typographical Union, 125 N.L.R.B. 759, 761 (1959). Both parties may put in new evidence at the § 8(b)(4)(D) stage, although often, as in the present cases, the parties agree to stipulate the record of the § 10(k) hearing as a basis for the Board's determination of the unfair labor practice. Finally, to exercise its powers under § 10(k), the Board need only find that there is reasonable cause to believe that a § 8(b)(4)(D) violation has occurred, while in the § 8(b)(4)(D) proceeding itself the Board must find by a preponderance of the evidence that the picketing union has violated § 8(b)(4)(D). *International Typographical Union, supra,* at 761 n. 5 (1959)."

When an unfair labor practice charge, other than 8(b)(4)(D), is filed under section 10(b), a preliminary investigation is made to determine whether the charge has enough prima facie merit to warrant issuance of a complaint. If so, a formal adjudication of the unfair labor practice follows. In contrast, the section 10(k) process does not take this usual course. As the Supreme Court noted in NLRB v. Plasterers', etc., Local Union No. 79, *supra,* 404 U.S. at 122 n. 10, a complaint on a section 8(b)(4)(D) charge does not issue until after the provisions of section 10(k) have been satisfied.

■ Under section 10(k) the Board issues a notice for a hearing. If the dispute has been adjusted, or if the Board finds no reasonable cause to believe that section 8(b)(4)(D) has been violated, because, as here, no jurisdictional dispute exists, the notice of hearing is quashed and the charge dismissed. If the parties achieve a voluntary settlement of the dispute, or if the Board decides the dispute under section 10(k) and the parties comply, the unfair labor practice complaint is also dismissed. In each of these situations, the unfair labor practice charge under section 8(b)(4)(D) is precluded from adjudica-

tion. The point is that there is no adjudication as provided for in section 10(b) and (c) which is reviewable under section 10(f). Granted that "the impact of the section 10(k) decision is felt in the § 8(b)(4)(D) hearing because for all practical purposes the Board's award determines who will prevail in the unfair labor practice proceeding,"[13] but its function is merely to set in motion the machinery for determining whether a complaint under section 8(b)(4)(D) should issue. Manhattan Construction Company v. NLRB, *supra,* 198 F.2d at 321. It is the subsequent section 8(b)(4)(D) proceeding which adjudicates the unfair labor practice charge and which is appealable under section 10(f). Based on the relationship of a jurisdictional dispute and a section 8(b)(4)(D) unfair labor practice, the Court of Appeals for the District of Columbia concluded, similarly, in *Bricklayers, etc., supra,* 475 F.2d 1316, that a section 10(k) determination is not a "final disposition" or adjudication within the meaning of the Administrative Procedure Act, 5 U.S.C.A. § 554.

■ Only if there is a determination of the dispute under section 10(k) and a subsequent refusal to comply, does a complaint issue on the unfair labor practice charge and proceed to a Board order. That is, in fact, the only manner in which a section 10(k) work award is reviewable—on review of a section 8(b)(4)(D) order. NLRB v. Local 991, International Longshoremen's Association, *supra,* 332 F.2d at 69–71. In this regard, the non-reviewable nature of a section 10(k) proceeding is like the representational certification procedure of section 9. A Board certification of a union as an employee bargaining representative is only reviewable if the employer refuses to bargain and an order under section 8(a)(5) issues from an unfair labor practice proceeding. The certification itself is not reviewable. American Federation of Labor v. NLRB, *supra,* 308 U.S. at 408–412.

---

13. NLRB v. Plasterers', etc., Union No. 79, *supra,* 404 U.S. at 126–127.

The scheme of the Act was drawn by Congress to allow appeal under section 10(e) and (f) only from a final order stemming from the unfair labor practice procedure of section 10(b) and (c). Other matters, such as determining the presence of a prima facie complaint for an unfair labor practice or certifying labor representatives, Congress meant to leave exclusively with the Board.[14] Like these, a quashing of the notice of hearing under section 10(k) is not adjudicatory in nature or final as defined by section 10(f). The motion of the Board to dismiss for want of jurisdiction is granted.[14a]

## THE SECTION 8(b)(7) VIOLATION

Consolidated on this appeal, is also a petition for review of the dismissal of a complaint by the Board charging a violation of section 8(b)(7)(C). This provision, 29 U.S.C.A. § 158(b)(7)(C), states:

"It shall be an unfair labor practice for a labor organization or its agents

—

(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:

(C) where such picketing has been conducted without a petition under

14. *See* Laundry Workers v. NLRB, *supra*, 197 F.2d at 703.

14a. Lest it appear that the failure to allow review of this action by the Board deprives the employer of some right to protect itself against this kind of picketing we think it appropriate to make the following comment. Upon the assumption that the Board was correct in, dismissing the section 10(k) proceeding on the ground that the dispute or the conduct of the Teamsters relative to Shell and its employees was not a "jurisdictional" dispute, it makes no difference to Shell that the action of the Board is not reviewable. Because if upon review we still have the view that the Board was correct in its determination that this was not a jurisdictional dispute, the Act does not afford any remedy to the picketed employer. In other words, it is only if either the Board in a section 10(k) proceeding or the court on review, assuming we reviewed it, determines that this dispute was jurisdictional, assigns the work to OCAW, and the Teamsters continue to picket, that Shell would have relief through a section 8(b)(4) action.

Shell urges the damage accomplished by the alleged unfair picketing as demanding relief. The Supreme Court in Garner v. Teamsters Union, 346 U.S. 485 [74 S.Ct. 161, 98 L.Ed. 228] (1953), however, has pointed out:

"The detailed prescription of a procedure for restraint of specified types of picketing would seem to imply that other picketing is to be free of other methods and sources of restraint. For the policy of

the National Labor Management Relations Act is not to condemn all picketing but only that ascertained by its prescribed processes to fall within its prohibitions. Otherwise, it is implicit in the Act that the public interest is served by freedom of labor to use the weapon of picketing." *Id.* at 499–500.

Shell still had alternate causes of action under the Act for any illegal picketing. In fact, Shell filed other charges under section 8(b)(4)(B), secondary boycott, and section 8(b)(7)(C), recognitional picketing, and has sought damages in a suit in New Jersey under section 303, 29 U.S.C.A. § 187. While the other unfair labor practice charges have had no success, the damage suit is still viable. It withstood a motion for summary judgment; the court finding that the section 10(k) proceeding did not "possess any attributes of finality," therefore, lacking any res judicata effect. Some small scope has also been left by the Norris-LaGuardia Act, 29 U.S.C.A. § 107, for the issuance of injunctions by federal courts. Finally, to the extent that the picketing is not forbidden or protected by the Act but is prohibited by state law, Shell is free to pursue its remedies in the state court. *Cf.* Garner v. Teamsters Union, *supra*, 346 U.S. at 488; Algoma Plywood Co. v. Wisconsin Board, 336 U.S. 301, 313, 69 S.Ct. 584, 93 L.Ed. 691 (1949); Hill v. Florida ex rel. Watson, 325 U.S. 538, 539, 65 S.Ct. 1373, 89 L.Ed. 1782 (1945); Allen-Bradley Local v. Wisconsin Board, 315 U.S. 740, 748–751, 62 S.Ct. 820, 86 L.Ed. 1154 (1942).

section 159(c) of this title being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing. . . ."

The principle element of a section 8(b)(7) violation is for an uncertified union to picket with "an object" of "forcing or requiring" an employer to recognize the picketing union as his employees' bargaining agent, or "forcing or requiring" the employees to organize as members of the union. Therefore, central to a finding of an unfair labor practice under section 8(b)(7) is a determination of the *object* of the picketing. Here, in rejecting Shell's claim that the picketing had a recognitional or representational purpose, the Board stated:

". . . We find that by picketing to enforce these demands, Respondent was merely attempting to obtain employment for Pollinger with wages and working conditions similar to those which he enjoyed under his former employer. Accordingly, we find from the above that the general counsel has not proven that Respondent violated section 8(b)(7)(C) of the Act and therefore we shall dismiss the complaint."

Shell would have this Court reverse the holding of the Board, and find that the picketing had a recognitional object.

■ The Board relied on Fanelli Ford Sales, Inc., 133 NLRB 1468 (1961), to support their ruling. *Fanelli* expressly reversed Lewis Food Co., 115 NLRB 890 (1956), under which the Board had promulgated a ruling that established *any* picketing for reinstatement as recognitional and, therefore, violative of section 8(b)(7). In *Fanelli*, the Board rejected *Lewis Food Co.*:

"The *Lewis Food* case held, member Peterson dissenting, that a strike or picketing by a union to obtain reinstatement of a discharged employee 'necessarily' is to compel recognition or bargaining on such matter and that

such conduct violates Section 8(b)(4)(C) of the Act. Our dissenting colleague would apply *Lewis Food* to the present 8(b)(7) situation. It may be not be gainsaid, of course, that picketing for an employee's reinstatement may in some circumstances be used as a pretext for obtaining recognition as collective-bargaining representative of all employees in a certain unit. Before we are willing to infer such broader objective, some more affirmative showing of such object must be made than exists here. So far as this record indicates, Respondent's picketing would have ceased if the Employer, without recognizing or, indeed, exchanging a word with the Respondent, had reinstated Marrone. We find in this case that the picketing was directed solely at securing Marrone's reinstatement. We further find that such conduct does not violate section 8(b)(7) of the Act. We accordingly overrule *Lewis Food* to the extent inconsistent herewith."

We agree with the Board's position in *Fanelli* that not all picketing for reinstatement is *per se* recognitional picketing.[15]

Shell contends that the union's objective manifestations undermine the Board's finding. Shell places great importance on the first letter composed by the union. Considering the other factors and the second letter, the first correspondence would "not create a presumption that the picketing is unlawful." McCleod v. Local 140, Bedding, Curtain and Drapery Workers Union, 207 F.Supp. 525, 528 (S.D.N.Y.1962). Furthermore, the Board, which is charged with investigative and fact finding responsibilities, could appropriately find that the second letter was a clear explanation of the union's aims. Nor does the wording of the picket signs indicate a recognitional purpose—"Shell unfair to William Pollinger/unfair to Teamsters Local 676." Signs analogous to the one used by the union in this case,

---

15. *See* Comment, Illegal Picketing under Section 8(b)(7)—A Reexamination, 68 Colum.L.Rev. 745 (1968).

have been held not to be persuasive evidence of a recognitional objective.[16]

At all times the union's actions were consistent with the Board's finding that their objective was to obtain the return of the truck driving job to Pollinger. The union first made inquiries to Catalytic for Pollinger's rehire. When this proved inadequate, Shell was approached. During part of this time an election for bargaining representative was being conducted at Shell's plant. The union did not intervene or participate in these proceedings or preliminary maneuvers leading to certification. At no time had the union attempted to obtain authorization cards from Shell's employees or organize them in any manner.

Shell argues that the Board's decision in Waterway Terminals, 193 NLRB 65, finding a section 8(b)(7) violation is controlling. There, Waterway, a freight interchanger unloading freight from barges and reloading it upon trucks and rail cars, terminated its contract with the company employed to do most of the reloading onto the railway cars. The work was then done by Waterway employees who were represented totally by IBU. ILWU represented the sixty to seventy employees displaced by the cancelling of the subcontract. ILWU attempted to convince Waterway to retain these employees and bargain with ILWU as their representative. When Waterway refused, ILWU picketed with the stated purpose of reinstatement of these sixty to seventy employees. The Board found a violation of section 8(b)(7). In the present case, the Board distinguished *Waterway*:

"Thus, in *Waterway Terminals*, the Respondent labor organization demanded as the price for withholding pickets an arrangement whereby its members would effect a mass displacement of the employees of Waterway who were represented by another labor organization. As the Trial Examiner pointed out in that case:

'Viewed realistically, the immediate objective of Respondent's demands and the inadvertible consequence of Waterway's acquiescence would have been the establishment of [Respondent] as the dominant voice in the representation of sixty or seventy employees affected by the change.'

"Here, however, Respondent was seeking the employment by Shell of only one employee at a time when no labor organization represented any of its employees. Shell's total work force was in excess of 130 employees. Thus it is clear that Respondent would not have had a dominant voice in the representation of Shell's employees if Shell had hired Pollinger and reassigned those employees who had been performing Pollinger's truck driving duties."

While agreeing with the Board that *Waterway* is not controlling, we do not adopt the Board's "dominant voice" standard. The number of employees whose reinstatement is sought compared to the number of employees in the production unit involved, is certainly one factor which may weigh heavily in determining the picketing's objective. The fact, that in this case, the reinstatement of only one employee is sought by the union is the mainstay supporting the Board's decision. But it is not necessary to exclude situations involving less than majority control or subterfuges such as a few employees fronting for the union. Just as an artfully worded picket sign is not determinative, the number of employees seeking reinstatement should not be the only factor examined. The object of picketing in a section 8(b)(7) complaint is primarily a fact determination. Therefore, all elements of proof relevant to the issue are important.[17]

---

16. NLRB v. Suffolk County District Counsel of Carpenters, 387 F.2d 170 (2d Cir. 1967); NLRB v. Local 239, International Brotherhood of Teamsters, 340 F.2d 1020 (2d Cir. 1965).

17. *See* NLRB v. Knitgoods, 403 F.2d 388, 390 (2d Cir. 1968) ("The wording of the signs, the solicitation of authorization cards, the threats of boycott and the general application of economic pressure are substantial

The standard of review requires that the Board's dismissal of the complaint be supported by substantial evidence in the record.[18] 29 U.S.C.A. § 160(f). Considering the findings concerning the actions the union did and did not take on which the Board based its dismissal, we conclude there was substantial evidence in the record to indicate that the object of the picketing was reinstatement.

Motion to dismiss petition No. 73–1399 is granted. The petition for review in No. 73–1401 is denied.

evidence of the recognitional nature of the picketing.").

18. NLRB v. United Brotherhood of Carpenters and Journeymen of America, Local 745,

450 F.2d 1255 (9th Cir. 1971); Teamsters Local Union No. 5 v. NLRB, 405 F.2d 864 (5th Cir. 1968).