**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 3, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, Respondent (two cases).**

**Nos. 990, 991, Dockets 75–4235, 75–4269.**

United States Court of Appeals, Second Circuit.

Argued May 11, 1976.

Decided Sept. 27, 1976.

John C. Rother, Atty., N. L. R. B., Washington, D. C. (Aileen A. Armstrong, Atty., John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., of counsel), for petitioner.

Norman Rothfeld, New York City (Menagh, Trainor & Rothfeld, New York City, of counsel), for respondent.

Before MOORE and TIMBERS, Circuit Judges, and NEWMAN,* District Judge.

MOORE, Circuit Judge:

The National Labor Relations Board ("Board") seeks enforcement of its orders, 220 NLRB No. 57 and 220 NLRB No. 117, in two consolidated cases which involve unfair labor practices in violation of the National Labor Relations Act ("Act"), 29 U.S.C. § 151 et seq., by Local 3, International Brotherhood of Electrical Workers, AFL–CIO ("Local 3"). For the reasons stated below, we grant enforcement.

I.

FACTS

The Board was justified, on the basis of the record as a whole, in finding the following facts:

Local 3 represents electricians who perform construction work within the City of New York ("City") for certain electrical contractors who are contractually affiliated with it. These contractors in turn perform work for, among others, the Board of Education ("School Board"), which contracts for the construction and repair of school buildings. Contracts are subject to a competitive bid and award system, with subdivision bid and award for electrical work if total construction costs are in excess of $50,000.

Among the contractors which bid successfully on School Board projects in early 1974 was a joint venture ("Wickham-Perone") formed by Wickham Contracting Co. ("Wickham"), which supplies funds and bonding capital, and Ralph Perone ("Perone"), an individual employer who possesses the necessary electrical license for work undertaken in the City. The electricians employed by Wickham and Perone, who apparently work intermittently on joint venture projects in the City, are represented by Teamster Local 363 ("Teamsters"). Perone is a party to an individual collective bargaining agreement with the Teamsters; Wickham is a member of the United Construction Contractors Association ("Association"), a multi-employer bargaining unit which also bargains with the Teamsters.

Beginning in 1973, Local 3 attempted to oust the Teamsters from their position as bargaining representative for employees of Association members; Local 3 sought Board certification in mid-1973, and an election to choose a bargaining representative was held

---

on September 19, 1974. Following a period during which the Board heard various challenges and objections to ballots cast in the election, it determined that the Teamsters had defeated Local 3.[1]

During 1974, Local 3 also applied pressure on Wickham to switch its bargaining representative from the Teamsters to Local 3, and in addition effected a work stoppage at School Board jobsites in an effort to force the School Board to award contracts only to Local 3 contractors.

The Wickham-related pressure began in July 1974 and included threats of trouble if Wickham did not capitulate, and picketing of the Wickham offices[2] and two Wickham jobsites.[3] The pickets, members of Local 3, carried signs, some of which read "Employees of Wickham on strike" or "Employees of Wickham-Perone on strike",[4] and others of which stated that the strike was for decent wages and recognition. Wickham's president (Biele) resisted this pressure, insisting that his employees had the right to choose their own representative and that Wickham, as a member of the Association, had a right and an obligation to bargain with the Teamsters.[5]

During the same period Local 3 members, with union sanction, walked off their jobs at School Board jobsites, complaining that the School Board was threatening the job security of Local 3 members by awarding contracts to employers who bargained with the Teamsters. Local 3 proposed that the School Board adopt a lay-off plan that would provide such job security; its legality was challenged by the School Board in view of the bid and award system under which the School Board has no direct dealings with construction trade unions but only with the competitive bidders for particular School Board contracts.[6] The shutdown of School Board jobsites continued until halted by federal court injunction.[7]

## II.

### FINDINGS BELOW

The Board found that with respect to Wickham, Local 3 violated section 8(b)(1)(B) of the Act[8] by restraining and coercing Wickham in the selection of its representatives for the purpose of collective bargaining.

With respect to the School Board, the Board concluded that Local 3 induced those of its members who were working at School Board jobsites, to walk off their jobs and, that further, such a strike in fact took place, all with an object of forcing the School Board to cease doing business with

1. Decision and Certification of Representative, Case No. 2–RC–16344, October 15, 1975.

2. There is some question as to whether Wickham or Wickham-Perone was the primary target of the pickets, since both Wickham and Perone have offices in the same building in Pelham, New York. The Board's finding that Local 3 pressured Wickham directly and through the School Board, pressured Wickham-Perone, Perone and others indirectly, is supported by the record and will not be disturbed.

3. One of the two was a joint venture jobsite.

4. Local 3 was apparently somewhat confused as to the status, vis-a-vis Wickham, of Wickham-Perone; hence, the signs referring to the joint venture. However, the record leaves little doubt, and the Board so concluded, that the pickets were aimed at Wickham in an attempt to force it to withdraw from the Association.

5. The Board also found that similar pressure was exerted on Iovine, Inc. ("Iovine") a New York corporation which also performs electrical work, and on Perone.

6. The School Board does have about seventy electricians on its own payroll who perform miscellaneous functions and these electricians are members of Local 3. However, there is no contract between the School Board and a trade union concerning them. Instead, they are paid the prevailing wage rate established by the City Controller's office.

7. United States District Court. E.D.N.Y., September 13, 1974.

8. Section 8(b)(1)(B) of the Act (29 U.S.C. § 158) provides:
 (b) It shall be an unfair labor practice for a labor organization or its agents—
 (1) to restrain or coerce . . . (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances . . ..

Wickham and other employers whose electricians were not members of Local 3; this, the Board found, was an unfair labor practice in violation of the Act's prohibition (section 8(b)(4)(i) and (ii)(B) ) [9] against secondary boycotts.

The Board entered cease and desist orders on both violations.

## III.

## SECONDARY BOYCOTT AGAINST THE SCHOOL BOARD

 The Board's finding that an object [10] of the work stoppage, if not the principal object,[11] was to pressure the School Board to cease awarding work to non-Local 3 contractors, specifically Wickham, Perone, and Iovine,[12] is supported by

substantial evidence and will not be disturbed.[13] This Court must accordingly reject Local 3's arguments that the work stoppage was legitimated by the expiration of Local 3's collective bargaining agreement,[14] and by a desire to preserve the union's work as evidenced by the proposed layoff plan.[15]

Under the facts as found by the Board, it is clear that Local 3 was engaged in a secondary boycott in contravention of section 8(b)(4)(B) of the Act. In *National Woodwork Manufacturers Assoc. v. N.L. R.B.*, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967), the Supreme Court approvingly quoted Judge Learned Hand's definition of the term:

"The gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute,

**9.** Section 8(b)(4)(i) and (ii)(B) of the Act (29 U.S.C. § 158) provides:

(b) It shall be an unfair labor practice for a labor organization or its agents—

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing . . . (Emphasis supplied)

**10.** As the Board correctly notes, an improper object need not be the only object of union activity in order to fall within the Act's proscription against secondary boycotts. *See Bedding, Curtain and Drapery Wkrs. Union, Local 140 v. N.L.R.B.*, 390 F.2d 495, 499 (2d Cir.

1968); *Refrigeration Contractors, Inc. v. Local Union No. 211 of the United Assoc. of Journeymen etc., AFL–CIO,* 501 F.2d 668, 670 (5th Cir. 1974); *Riverton Coal Co. v. United Mine Workers of America,* 453 F.2d 1035 (6th Cir. 1972), *cert. denied,* 407 U.S. 915, 92 S.Ct. 2439, 32 L.Ed.2d 690.

**11.** Petitioners Appendix at 23.

**12.** *See* n.5 *supra.*

**13.** *Bedding, Curtain and Drapery Wkrs. Union, Local 140 v. N.L.R.B., supra* at 390 F.2d 500; *N.L.R.B. v. Mueller Brass Co.,* 501 F.2d 680, 683–4 (5th Cir. 1974). Questions of motive and intent are factual and therefore to be determined by the trier of fact—here, the Board. *Shell Chemical Co. v. N.L.R.B.,* 495 F.2d 1116 (5th Cir. 1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 449.

**14.** The fact that Local 3's contract with its own employers had expired does not *ipso facto* legitimize the improper object of the work stoppage, at least in a case such as this where the work stoppage occurred only at selected sites.

**15.** This case does not present the issue of a work stoppage alleged to be in protest of an employer's breach of an existing work preservation agreement, but involves simply secondary pressure in the hope of acquiring work.

Even assuming *arguendo* that Local 3 had legitimate motives for proposing a lay-off plan, the attempt to restrain or coerce a neutral employer brings the union's activity within the ambit of section 8(b)(4)(B).

but upon some third party who has no concern in it. *Its aim is to compel him to stop business with the employer in the hope that this will induce the employer to give in to his employees' demands."* 386 U.S. at 627, n.16, 87 S.Ct. at 1259, quoting *International Bro. of Electrical Workers, No. 501 v. N.L.R.B.,* 181 F.2d 34, 37 (2d Cir. 1950) (emphasis supplied)

Explicating further, the Supreme Court, in a discussion particularly appropriate to the case at bar, made clear that a union's attempts to control the amount of unit work procured by its members' employers, through means of pressuring third parties, falls squarely within the definition.[16] Reviewing the legislative history and commenting on its decision in *Allen Bradley Co. v. Local Union No. 3, etc., Electrical Workers,* 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), the Court wrote as follows:

"*Allen Bradley* held violative of the antitrust laws a combination between Local 3 of the International Brotherhood of Electrical Workers and both electrical contractors and manufacturers of electrical fixtures in New York City to restrain the bringing in of such equipment from outside the city. . . . [T]he boycott of out-of-state electrical equipment by the electrical contractors' employees was not in pursuance of any objective relating to pressuring their employers in the matter of *their* wages, hours, and working conditions; there was no work preservation or other primary objective related to the union employees' relations with their contractor employers. *On the contrary, the object of the boycott was to secure benefits for the New York City electrical manufacturers and their employees.*

'This is a secondary object because the cessation of business was being used tactically, with an eye to its effect on conditions elsewhere.' Second, and of even greater significance on the question of the inferences to be drawn from the references to *Allen Bradley,* Senator Taft regarded the Local 3 boycott as in effect saying, '*We will not permit any material made by any other union* or by non-union workers *to come into New York City and be put into any building* in New York City.' 93 Cong.Rec. 4199, II 1947 Leg. Hist. 1107. *This clearly shows that the Senator viewed the pressures applied by Local 3 on the employers of its members as having solely a secondary objective.* The Senate Committee Report echoes the same view:

'[It is] an unfair labor practice for a union to engage in the type of secondary boycott that has been conducted in New York City by local No. 3 of the IBEW, whereby *electricians have refused to install electrical products of manufacturers employing electricians who are members of* [emphasis added] *some labor organizations other than local No. 3.*' S.Rep. No. 105, 80th Cong., 1st Sess., 22, I 1947 Leg.Hist. 428. (Emphasis supplied.)

Other statements on the floor of Congress repeat the same refrain. Third, even on the premise that Congress meant to prohibit boycotts such as that in *Allen Bradley* without regard to whether they were carried on to affect labor conditions elsewhere, *the fact is that the boycott in Allen Bradley was carried on, not as a shield to preserve the jobs of Local 3 members, traditionally a primary labor*

---

**16.** The words of Mr. Justice Harlan, who concurred in the Court's opinion, are particularly apt. Commenting on the Court's holding that the union's dispute was with a "primary", and not a "secondary", employer, he wrote:

"The facts as found by the Board and the Court of Appeals show that the contractual restrictive-product rule in question, and the boycott in support of its enforcement, had as their sole objective the protection of union members from a diminution of work flowing from changes in technology. Union mem-

bers traditionally had performed the task of fitting doors on the jobsite, and *there is no evidence of any motive for this contract provision and its companion boycott other than the preservation of that work. This, then, is not a case of a union seeking to restrict by contract or boycott an employer with respect to the products he uses for the purpose of acquiring for its members work that had not previously been theirs.*" 386 U.S. at 648, 87 S.Ct. at 1270 (emphasis supplied).

*activity, but as a sword, to reach out and monopolize all the manufacturing job tasks for Local 3 members."* 386 U.S. at 628, 629–630, 87 S.Ct. at 1260–1261 (footnotes omitted, emphasis supplied in part).

This is precisely the same activity undertaken once again by Local 3 in the present case. The work stoppage on School Board jobsites by Local 3 had nothing whatever to do with management-employee relations between the School Board and Local 3—indeed, it could not, since the School Board has *no collective bargaining agreement with Local 3*[17] and is responsible for *no aspect of the union's working conditions or wages.*[18] In effect, the work stoppage was aimed at those Association members, principally Wickham, with whom Local 3 was engaged in a primary dispute of dubious legality,[19] the purpose of which was to expropriate for itself, electrical work being performed by the Teamsters, thus giving Local 3 a monopoly over such work. Under this scheme, the School Board was clearly a neutral employer drawn illegally into a primary dispute between Local 3 and non-Local 3 employer-contractors. Local 3's arguments that the School Board was not a "neutral" employer because the Board (1) was not "wholly unconcerned"[20] in the controversy, and (2) might have hired union members directly if it abandoned the bid and award system, are entirely without merit. The second is patently frivolous, being based upon pure speculation.[21] As

for the first, we are in agreement with the decision in *Carpet, Linoleum, Soft Tile etc. Local No. 419, AFL–CIO v. N.L.R.B.*, 151 U.S.App.D.C. 338, 467 F.2d 392, 400–401 (1972).[22] In that case, the Court found that picketing of a Sears, Roebuck store by certain floor installers' union employees, with an object of forcing Sears to cease doing business with certain installers of floor coverings with whom the union was disputing, constituted a secondary boycott; the Court's decision noted that

"the mere fact that the relationship between two parties involves some economic interdependence is not sufficient in and of itself to cause one of the parties to lose its 'secondary' status, for section 8(b)(4)(B) purposes, *vis-a-vis* the other party. This conclusion is dictated by the very nature of secondary boycotts. It is intuitively obvious that a union which is engaged in a labor dispute with one party will not endeavor to enlist the support of another party, *unless* there is some relationship present, direct or indirect, between the two parties. This most frequently involves an economic relationship. Without the presence of *some* interrelationship between the two parties, it would be an exercise in futility for the union to seek the aid of the second party, since it would necessarily have no possible means of providing meaningful support for the union. It is therefore logically apparent that something more than mere

---

**17.** Although the electricians employed directly by the School Board are members of Local 3, the School Board does not negotiate with the local. The men's pay is determined by the City Controller's Office. *See* Petitioner's appendix at 10.

**18.** *See* n. 17, *supra*.

**19.** See this opinion, *supra* at p. 862.

**20.** Respondent's brief at 10, citing *National Woodwork, supra*. We do not agree with Local 3's interpretation of a "neutral" employer which would apparently bar any concern or stake by third-party employers in a primary labor dispute. See this opinion *infra* at p. 865.

**21.** It is conceded by all that the School Board does not maintain a labor force to work on construction projects such as those undertaken

by Local 3, and it is further conceded that the School Board contracts out for such work on a bid and award basis.

**22.** Our view of the School Board's neutrality renders it unnecessary for us to consider the "right of control" test presently *sub judice* before the Supreme Court. *N.L.R.B. v. Enterprise Ass'n etc., Local Union No. 638,* 172 U.S. App.D.C. 225, 521 F.2d 885 (1975), *cert. granted* 424 U.S. 908, 96 S.Ct. 1101, 47 L.Ed.2d 311 (1976). *Cf. N.L.R.B. v. Local 810, Steel, Metals, Alloys & Hardware Fabricators & Warehousemen etc.,* 460 F.2d 1 (2d Cir. 1972) (Question of neutrality must be decided on a case-by-case basis, not by application of a technical test.)

economic interdependence between two parties is required before one loses its 'secondary' status with respect to the labor disputes of the other." (Footnote omitted; emphasis in original.)

In a situation analogous to the one before us, this Court held in *Bedding, Curtain and Drapery Wkers. Union, Local 140 v. N.L.R.B.*, 390 F.2d 495 (2d Cir. 1968), that a secondary boycott occurred where a mattress workers' union picketed retail stores with an object of forcing those stores to cease carrying mattresses made by manufacturers who did not employ members of the picketing union.[23] And, in *N.L.R.B. v. Local 3, International Brotherhood of Electrical Workers, AFL–CIO*, 467 F.2d 1158 (2d Cir. 1972), we specifically noted, in connection with Local 3's attempt to shut down the jobsite of a neutral general contractor (New York Telephone Company), that

"A threatened work stoppage of a neutral employer for the purpose of effecting a change in work assignment of the primary employer is a violation of § 8(b)(4)(ii)(B)." 467 F.2d at 1160 (citation omitted.)

*See also Refrigeration Contractors, Inc. v. Local Union No. 211, United Association of Journeymen, etc., AFL–CIO*, 501 F.2d 668 (5th Cir. 1974), wherein Local 211's boycott of a general contractor's jobsite, in an attempt to pressure that contractor to replace a particular subcontractor's employees with the Local 211 employees of a different subcontractor, was held to be a secondary boycott; *and see George Koch Sons, Inc. v. N.L.R.B.*, 490 F.2d 323, 327–8 (4th Cir. 1973); *N.L.R.B. v. Local No. 18, International Union of Operating Engineers, AFL–CIO*, 503 F.2d 780 (6th Cir. 1974).

For the foregoing reasons, we uphold the Board's determination that the action taken against the School Board by Local 3 constituted a secondary boycott in violation of section 8(b)(4) of the Act.

---

**23.** It should be emphasized that the present case involves not mere picketing against a neutral, but an actual work stoppage.

## IV.

### COERCION OF WICKHAM, et al.

■ Ample evidence in the record also supports the Board's finding that Wickham was threatened and picketed by Local 3 in an attempt by that union to force Wickham's withdrawal from the Association and to coerce Wickham into directing its own employees to designate Local 3 as their representative in lieu of the Teamsters.

■ It is conceded by all that Wickham's choice of a bargaining representative was the Association. The right to select one's bargaining representative is protected by the express terms of the Act,[24] and it is a right which belongs no less to management than it does to labor.

"This right of employees and the corresponding right of employers, see section 8(b)(1)(B) of the Act, 29 U.S.C. § 158(b)(1)(B), to choose whomever they wish to represent them in formal labor negotiations is fundamental to the statutory scheme. In general, either side can choose as it sees fit and neither can control the other's selection . . ." *General Electric Company v. N.L.R.B.*, 412 F.2d 512, 516 (2d Cir. 1969) (citations omitted).

In *N.L.R.B. v. Local 964, United Bro. of Carpenters and Joiners*, 447 F.2d 643 (2d Cir. 1971) this Court was confronted with analogous factual situation and reached the same conclusion which we reach here:

"[A]gents of the union began to inform members of the charging party [multi-employer association for collective bargaining] that they would experience problems in obtaining carpenters if they remained with the charging party and did not bargain through the Rockland County Carpenter Contractors Association, a recently formed group similar to the charging party. . . .

\* \* \* \* \* \*

---

**24.** *See* n. 8, *supra*. The corresponding right of employers is found in section 7 of the Act, 29 U.S.C. § 157.

There is ample evidence on the record to support the Board's finding that the union violated Sections 8(b)(1)(B) and 8(b)(3) of the Act by restraining and coercing employer-members of the charging party in the selection of their representative for the purposes of collective bargaining. We have held that the 'right of employees and the corresponding right of employers, see section 8(b)(1)(B) * * to choose whomever they wish to represent them in formal labor negotiations is fundamental to the statutory scheme.' *General Electric Co. v. N.L.R.B.*, 412 F.2d 512, 516 (2d Cir. 1969). The uncontradicted evidence shows that union representatives threatened several charging party members with trouble if they did not leave the charging party and bargain through the Carpenter Contractors Association. These members did in fact experience difficulty . . . .. Union representatives told one charging party member that '[i]t would be wise if [he] signed an agreement with the * * * Carpenters Association because * * * [the charging party] was going to have a lot of labor trouble' and told another that 'You are in the wrong organization. * * * ' On this undisputed record, the Board reasonably concluded that the union threatened and coerced employers in the selection of their bargaining representative in violation of Sections 8(b)(1)(B) and 8(b)(3) of the Act." 447 F.2d at 644–645.

This Court has specifically held that where a strike or threats of trouble are undertaken by a union for the express purpose of forcing an employer to bargain with or recognize the union, notwithstanding that a *different* union has been designated the certified representative of the employer's employees, a violation of Section 8(b)(4)(B) will result.[25] We reiterate today the applicability of that holding to the picketing[26] and threats[27] directed at Wickham by Local 3, a union which, it must be remembered, was actually *defeated* in a certified election *among employees (including* those of Wickham) to select a designated bargaining representative.

■ Finally, we note that, in effect, Local 3 was pressuring Wickham to discriminate *against its own employees* and in fact to coerce *them* in the selection of *their* chosen representative.[28] This is in itself a violation of the Act[29] and a fundamental abuse of the rights and responsibilities of labor representation.[30]

25. *Douds v. Local 1250, Wholesale Dept. Store Union*, 170 F.2d 700, 701 (2d Cir. 1948) (A. Hand, Clark, Frank).

26. The Board found (Petitioner's Appendix at 50–51) that various pickets contained language to the effect that Wickham et al. did not pay decent wages or maintain decent working conditions, and that the employees of Wickham and Wickham-Perone were on strike, allegations of questionable legitimacy at best. However, irrespective of the truth of the statements, the picketing of a neutral employer constituted a prohibited secondary boycott. *See N.L.R.B. v. Lafayette Building & Const. Trades Council*, 445 F.2d 495, 497 (5th Cir. 1971).

27. In *Sperry Systems Man. Div., Sperry Rand Corp. v. N.L.R.B.*, 492 F.2d 63, 67 n. 4 (2d Cir.), *cert. denied, Local 455 Intern. Union of Elec., Radio and Machinists Wkrs., AFL–CIO v. Sperry Systems Man. Div., Sperry Rand Corp.*, 419 U.S. 831, 95 S.Ct. 55, 42 L.Ed.2d 57 (1974) we stated:

"Demands by a union to represent employees outside the certified union are unfair labor practices even if no disruption occurs."

28. *N.L.R.B. v. Local 208, International Bro. of Teamsters*, 291 F.2d 374 (9th Cir. 1961); *N.L.R.B. v. Local 138, Intern. Union of Operating Engineers*, 385 F.2d 874, 877 (2d Cir. 1967). *See also N.L.R.B. v. Intern. Longshore. Ass'n, Local No. 1581*, 489 F.2d 635, 637 (5th Cir. 1974).

29. *See* n. 23, *supra.*

30. In the recent case of *N.L.R.B. v. Local Union No. 584, International Brotherhood of Teamsters*, 535 F.2d 205 (2d Cir. 1976), the respondent local threatened the Hertz Corporation with picketing and strikes unless certain maintenance work was taken away from the machinists union and re-assigned to the Teamsters. Violation of section 8(b)(4)(ii)(D) was charged, and this Court, after reviewing the facts, stated that

"there is no question but that the union has committed unfair labor practices within the plain meaning of the statute." 535 F.2d at 207.

The petition of the Board for enforcement of its order is granted in full.